# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| HAROLD MALIN and SANDRA JOAN : | |
| MALIN REVOCABLE TRUST, : | |
| Individually and On Behalf of Others : | |
| Similarly Situated, : | |
| Plaintiffs, : | |
| vs. : | Civil No. 3:03cv2001 (PCD) |
| : | |
| XL CAPITAL LTD., et al., : | |
| Defendants. : | |

## RULING ON DEFENDANTS' RENEWED MOTION TO DISMISS & PLAINTIFFS' MOTION TO PRECLUDE DOCUMENTS & ARGUMENTS INCONSISTENT WITH JUDICIAL NOTICE

This action is a securities class action suit brought by various individual plaintiffs (collectively "Plaintiffs") on behalf of purchasers of XL Capital Ltd. ("XL" or the "Company") publicly traded securities from November 1, 2001 through October 16, 2003 (the "Class Period") against XL and several of its executive officers: Brian M. O'Hara, Jerry de St. Paer, Ronald L. Bornhuetter, Nicholas M. Brown, Jr., and Henry Charles V. Keeling (collectively, the "Individual Defendants"). Plaintiffs bring this action alleging that Defendants engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and that the Individual Defendants were "controlling persons" under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and therefore derivatively liable for the Company's fraudulent acts. The crux of Plaintiffs' allegations is that Defendants knowingly issued false and misleading statements regarding the Company's financial condition by failing to adequately reserve for losses in its NAC Re reinsurance operations in order to artificially inflate the price of the Company's stock

and maintain the Company's financial strength and debt ratings.

Defendants are now renewing their motion, pursuant to 15 U.S.C. § 78u-4(b)(3)(A) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), to dismiss the Second Amended Class Action Complaint (the "SAC") for violations of the Federal Securities Laws on the ground that the SAC fails to satisfy the pleading requirements of the PLSRA. Prior to the filing of this renewed motion, Plaintiffs moved to preclude Defendants from submitting documents and arguments inconsistent with judicial notice. For the reasons stated herein, Plaintiffs' Motion to Preclude Documents and Arguments Inconsistent with Judicial Notice [Doc. No. 150] is **granted in part** and **denied in part** and Defendants' Motion to Dismiss [Doc. No. 154] is **granted**.

I.      **BACKGROUND**[1]

XL is a Bermuda-based financial service holding company that provides reinsurance through its operating subsidiary, XL Reinsurance America, Inc. ("XLRA," formerly NAC Reinsurance Corporation or "NAC Re").[2] (SAC ¶¶ 11, 13.) As a reinsurer, XL provides insurance to direct or primary insurers, or "ceding companies,"[3] who transfer all or part of the risk they underwrite, pursuant to a policy or group of policies, to XL, as the reinsurer. The ceding companies pay premiums, in exchange for which the reinsurer agrees to indemnify the ceding insurer on the risk transferred. A portion of the premiums collected from the ceding

---

[1]     The following facts are taken from the SAC, unless otherwise noted.

[2]     NAC Re, acquired by XL in June 1999, is XL's United States reinsurance operation and during the Class Period was also known as "XL Re America," "XL Reinsurance America," and "XLRA." (See SAC ¶¶ 2, 13 & n.2.)

[3]     A "ceding company" is a company that transfers all or part of an insurance risk to another company through reinsurance. (Pls.' Mem. Opp'n Mot. Dismiss 1.)

companies are set aside as "loss reserves," which represent the amount a reinsurance company estimates it will have to pay to cover the ceding insurers' claims under the policies that have been written to date. Loss reserves are established when the insurance contract is signed and are later revised as claims are submitted and more information becomes available about the likely amount the reinsurer will have to pay under the policy. Here, Plaintiffs allege that XL and the Individual Defendants defrauded investors during the Class Period by knowingly and falsely representing that XL had sufficient loss reserves to cover the losses that fall within the coverage assumed. As a consequence of these alleged misrepresentations, Plaintiffs contend that the Company's shares sold at artificially inflated prices which later fell after the truth became known to the market. Plaintiffs' allegations are based on various SEC filings, analyst reports, press releases, "relevant Company documents" and interviews with four confidential witnesses ("CW1", "CW2", "CW3" and "CW4"), each of which is alleged to have been employed in various units at the Company.

XL acquired NAC Re in June 1999 for $1.2 billion. In connection with the merger, XL increased loss reserves by $95 million. It later became apparent, however, that the 1997 through 2000 accident years[4] were developing adversely. A Report on Examination of the NAC Reinsurance Corporation covering the five-year period from January 1, 1995 through December 31, 1999 was published on May 31, 2002 by the New York Insurance Department ("NYID") ("NYID Report"). As set forth in the Report, the NYID found that the Company had, as of December 31, 1999, understated loss reserves by $189 million. (NYID Report 25, Ex. 2 to SAC.) In 2000, XL took another charge to income of $122 million to increase loss reserves for its NAC Re operations. During the Class Period, XL increased loss reserves three more times, taking

---

[4] "Accident year" refers to the year in which a loss occurred.

3

additional charges of $180 million in 4Q01, $215 million in 4Q02 and $184 million in 3Q03. Following the October 17, 2003 announcement of the $184 million reserve shortfall, Defendant O'Hara, on behalf of the Company, announced in a press release that the Company would conduct "an intensive claims audit and review of the ceding company claims files," with the intention of "fully address[ing] [the Company's] exposure to the 1997 through 2000 North American casualty reinsurance book written by the former NAC Re so that it will not adversely affect [XL's] financial results in 2004 and beyond." The "comprehensive claims audit review" uncovered an additional $663 million reserve shortfall, which was taken in 4Q03 and announced on January 13, 2004. XL's loss reserve increases, taken together, totaled over $1.36 billion.

On January 14, 2004, the day after XL announced the $663 million reserve shortfall, various insurance ratings agencies lowered their ratings and downgraded XL. Specifically, S&P downgraded the financial strength ratings of XL's core operating subsidiaries to 'AA-' from 'AA' and removed them for CreditWatch, noting that "[t]he outlook is stable." Rating agency A.M. Best placed XL's 'A+' (Superior) financial strength rating under review with negative implications, rating agency Moody's downgraded XL Re's financial strength rating to 'Aa3' from 'Aa2,' with a stable outlook, and rating agency Fitch put XL's 'AA' financial strength rating on Rating Watch Negative mainly due to uncertainty relating to capital raising. A.M. Best stated that the reserve charge "was larger than we had anticipated, cumulatively for the year," and S&P similarly stated that "[w]e have taken a rating action on XL group because charges were higher than we had anticipated." According to Moody's, "the charges, together with others taken in 2002 and at the time of the acquisition of XL Reinsurance America in 1999, called into question the quality of the underwriting and actuarial controls under the operation's former NAC Re

control." A report issued by Deutsch Bank-North America on January 15, 2004 discussed managements' corrective actions to assure that further revenue shortfalls would not occur, stating: "Reserve review appears to be comprehensive. . . . Reserve charge appears extremely conservative. . . . The company appears to be taking a number of steps in its reserving process to reduce the possibility of reserving errors in the future."[5]

Also on January 14, 2004, XL announced the firing of two executives, namely C. Fred Madsen, President of NAC Re reinsurance operations, and Martha Bannerman, XL's General Counsel and Chief Administrative Officer of its NAC Re reinsurance operations. One week later, Defendant Brown, Chief Executive Officer of XL's insurance and formerly Chief of Reinsurance Operations at NAC Re, left the Company.

On May 18, 2001 and September 4, 2001 respectively, XL issued $1.01 billion principal amount at maturity of Zero Coupon Convertible Debentures ("CARZ") and $509 million principal amount at maturity of Liquid Yield Option Notes ("LYONs"). Each of the CARZ and LYONs debt securities gave bondholders the right to require XL to repurchase the bonds on predetermined dates ("put" dates) at predetermined values. During the Class Period, a put date for the CARZ was scheduled to occur on May 23, 2002 and for the LYONs on September 7, 2002 and September 7, 2003. The repurchase obligations were also subject to credit ratings assigned by S&P's bond rating agency, such that if XL's financial strength and credit ratings fell below the level of "BBB+," that too would trigger bondholders' rights to demand conversion into shares at 5.9467 shares per CARZ and 5.277 shares per LYONs.

---

[5]      Although the announcement of the $663 million reserve increase caused the ratings agencies to downgrade or lower XL's debt and credit ratings, it does not appear to have impacted the price of XL stock. (See SAC ¶ 41; S&P stock price data, Ex. I to Stapleton Decl.)

The Individual Defendants named in this suit hold various positions at XL and XLRA. Brian M. O'Hara is and was, at all times during the Class Period, XL's President and Chief Executive Officer ("CEO"), and has served as a director of XL since 1986. O'Hara signed all of the Company's public filings with the SEC during the Class Period and was the chief spokesperson for the Company, as he was consistently quoted in Company press releases and spoke on behalf of the Company during conference calls. Jerry de St. Paer is and was, at all times during the Class Period, XL's Executive Vice President and Chief Financial Officer ("CFO"). Along with O'Hara, de St. Paer signed all filings made with the SEC. Nicholas M. Brown, Jr. was, at all relevant times, XL's Executive Vice President and Chief Executive of Insurance Operations at XLRA. Brown also served as President and CEO of NAC Re until it merged with XL in June 1999, at which point Brown was appointed Chief Executive of Insurance Operations at XLRA. Henry Charles V. Keeling was, at all relevant times, CEO of XL's Reinsurance Operations. According to the SAC, Keeling was present during the October 20, 2003 and January 14, 2003 company conference calls. Ronald L. Bornhuetter is and was, at all times during the Class Period, an outside director at XL. Prior to the Class Period, Bornhuetter was an actuary and served as Chairman of NAC Re from 1993 until 1999 and Chairman of the Board of NAC Re Reinsurance Corporation from 1990 until 1999. Bornhuetter signed the Registration Statement and/or amendments to the Shelf Offering, the 2001 Report on Form 10-K and the 2002 Report on Form 10-K.

During the Class Period, the Individual Defendants sold more than 400,000 shares of XL

stock for proceeds of $35.6 million and took in over $8.1 million in incentive bonuses.[6]

Plaintiffs allege that these trades were timed in a manner designed to "t[ake] advantage of XL's

artificially inflated stock price." (SAC ¶ 47.)

## II.     STANDARD OF REVIEW

A district court ruling on a motion to dismiss for failure to state a claim should accept all

factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's

favor. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); <u>Ganino v.</u>

<u>Citizens Utilities Co.</u>, 228 F.3d 154, 161 (2d Cir. 2000).  The court need not accept, however,

"mere conclusions of law or unwarranted deductions," <u>First Nationwide Bank v. Gelt Funding</u>

<u>Corp.</u>, 27 F.3d 763, 771 (2d Cir. 1994), or "the truth of factual allegations that are contradicted

by documents properly considered on a motion to dismiss." <u>In re Van Der Moolen Holding N.V.</u>

<u>Sec. Litig.</u>, 405 F. Supp. 2d 388, 396 (S.D.N.Y. 2005) (citing <u>Rapoport v. Asia Elecs. Holding</u>

<u>Co.</u>, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).  Even under Federal Rule of Civil Procedure

12(b)(6), a plaintiff's factual allegations must be sufficient "to state a claim to relief that is

plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, ___ U.S. ___, 127 S. Ct. 1955, 1960, 167

L. Ed. 2d 929 (2007); <u>see also</u> <u>Iqbal v. Hasty</u>, __ F.3d __, 2007 U.S. App. LEXIS 13911, 2007

WL 1717803, at *11 (2d Cir. June 14, 2007) ("requiring a flexible 'plausibility standard,' which

obliges a pleader to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim plausible"). Although detailed factual allegations are

---

[6]     According to XL's 2001 proxy statement, XL executive officers' bonuses were based forty percent
on growth in cash EPS, thirty percent on cash return on tangible equity, twenty percent on total
return on tangible equity and ten percent on growth in book value, including dividends paid but
excluding unrealized appreciation or depreciation of investments.

not required, a plaintiff must provide the grounds of her entitlement to relief beyond mere "labels and conclusions"; "a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65. As discussed more fully below, however, Plaintiffs also must meet the "exacting pleading requirements" of the PSLRA, which requires Plaintiffs to adhere to significantly more stringent pleading requirements. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. ___, No. 06-484, 2007 U.S. LEXIS 8270 (June 21, 2007).

Generally, district courts should decide the motion to dismiss on the complaint alone, excluding additional evidence, affidavits, exhibits, and factual allegations contained in legal briefs or memoranda. Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000); accord Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002) (reiterating that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough"). The following materials may, however, properly be considered on a Rule 12(b)(6) motion to dismiss:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (citations omitted), aff'd on other grounds, Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005);

Mangiafico v. Blumenthal, 358 F. Supp. 2d 6, 9 (D. Conn. 2005).

Under the "incorporation by reference" doctrine, district courts may consider documents submitted by a defendant on a motion to dismiss if the documents are explicitly relied on in and integral to the plaintiff's complaint. I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991); accord Chambers, 282 F.3d at 152-53; Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); see also Stuto v. Fleishman, 164 F.3d 820, 826 n.1 (2d Cir. 1999) (finding the district court's consideration of a document on a motion to dismiss permissible because the document was discussed in the complaint, and thus incorporated by reference); Int'l Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (holding that even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (consideration of documents permissible when there is "undisputed notice to plaintiffs of their contents and [the documents] were integral to plaintiffs' claim"), cert. denied, 503 U.S. 960 (1992); Philadelphia Parking Auth. v. Federal Ins. Co., 385 F. Supp. 2d 280, 285 (S.D.N.Y. 2005).

A court may take judicial notice of facts that are "not subject to reasonable dispute," such that they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b)(2); see also Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991). In cases of securities fraud, the failure to view additional evidence could prevent courts from dismissing complaints which selectively quote portions of a company's filings. See id.

## III.    PLAINTIFFS' MOTION TO PRECLUDE[7]

Defendants submitted seven documents cited and relied upon in Plaintiffs' SAC, none of which is cited by Defendants for the truth of what it says.[8]  Plaintiffs acknowledge that these documents are already properly incorporated into the SAC and contend that the Court may consider them not for the truth of their contents, but only to determine what the documents stated. (See Pls.' Mem. Supp. Mot. Preclude 8.)  Defendants also submitted SEC filings on Forms 3, 4 and 5 and a copy of Standard & Poor's ("S&P") Daily Stock Price Record for the truth of the matters contained therein.  Plaintiffs argue that regardless of whether the remaining documents are incorporated by reference or are matters of which judicial notice may be taken, the Court may only look to these documents to determine what they stated and not to prove the truth of their contents. (See id. at 3.)

### A.    Transcripts from XL's January 29, 2002 Presentation and October 20, 2003 Conference Calls

Defendants submitted transcripts from XL's January 29, 2002 Presentation and October 20, 2003 Conference Calls in order to show that Plaintiffs' characterizations and paraphrases thereof are inaccurate and misleading.  Plaintiffs assert that "it is unknown who transcribed the

---

[7]    Rather than waiting for Defendants to submit their renewed motion to dismiss, as ordered by this Court in its February 6, 2007 Ruling on Defendants' Motion for Protective Order [Doc. No. 147], Plaintiffs preemptively moved to "preclude documents and arguments inconsistent with judicial notice."  Plaintiffs' unusual motion requests that the Court not entertain a renewed motion to dismiss, notwithstanding the fact that this Court already found that such a motion was appropriate. Plaintiffs also preemptively moved to preclude certain documents and requested that the Court not consider certain documents for their truth.  Several of these issues are moot, which would have become apparent had Plaintiffs waited for Defendants to file their renewed motion to dismiss before moving to preclude or strike.

[8]    The seven documents referenced are: XL's Forms 10-K for 2000 through 2003; a transcript of XL's January 29, 2002 presentation by Defendant Brian M. O'Hara; a transcript of the October 20, 2003 conference call; and a certified copy of the NYID Report.

conference calls, what medium they were transcribed from, and the source of the conference call recording," and argue that the transcripts cannot be judicially noticed or considered for their truth because their accuracy is in dispute.[9] (Pls.' Mem. Supp. Mot. Preclude 14.) According to Defendants, however, the transcripts were obtained from Plaintiffs themselves in discovery, correspond verbatim to the quotes in the SAC and were represented by counsel for Plaintiffs during the parties' discussions to be the sources of the quotes and paraphrases in paragraphs 18, 19, 91, 94, 185, 186, 232 and 246 of the SAC, even though they are not explicitly cited in the SAC. (See Defs.' Mem. Opp'n Mot. Preclude 4.)

Although in general, documents may be considered under the "incorporation by reference" doctrine if they are explicitly relied on in and integral to the plaintiff's complaint, Chambers, 282 F.3d at 152-53 (citing Int'l Audiotext Network, Inc., 62 F.3d at 72), courts have held with regard to transcripts that where the allegations do not expressly mention or refer to the transcripts and the plaintiffs dispute their authenticity, they cannot be considered. Cooper v. Pickett, 137 F.3d 616, 623 (9th Cir. 1997); see also In re Scholastic Sec. Litig., No. 97 Civ. 2447 (JFK), 1998 U.S. Dist. LEXIS 13910, at *4-5 (S.D.N.Y. Sept. 1, 1998) (declining to consider an unverified transcript of a conference call, despite the fact that the complaint refers to the conference call, when the complaint does not expressly mention or refer to the transcript itself). In this case, however, Plaintiffs not only quote directly from the transcripts in the SAC, but also quote them and cite them numerous times in their Memorandum in Opposition to Defendants'

---

[9]     Plaintiffs concede, in their motion to preclude, that the transcripts can be considered for their contents. (Pls.' Mem. Supp. Mot. Preclude 14.)

Renewed Motion to Dismiss.[10]  Defendants cite the transcripts merely to show that Plaintiffs' quotations therefrom are misleading.  Courts have routinely held that when a complaint quotes documents only in part and omits critical portions of the documents, it is permissible for the court ruling on a motion to dismiss to consider the full texts of the quoted documents. Cooper, 137 F.3d at 623; accord In re Hunter Envtl. Servs., Inc. Sec. Litig., 921 F. Supp. 914, 918 (D. Conn. 1996); see also Kramer, 937 F.2d at 774 ("Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure" and such complaints might be filed "solely to extract nuisance settlements."); In Re Silicon Graphics Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999) ("Although [the plaintiff] questions the veracity of the . . . forms, her ongoing and substantial reliance on the forms as a basis for her allegations substantially weakens her position.").  For these reasons, the Court finds it appropriate to consider the contents of the transcripts in ruling on the Renewed Motion to Dismiss.

**B.     SEC Forms 3, 4 and 5**

Plaintiffs argue that the Court should only take judicial notice of SEC documents to determine what the documents stated, not to prove the truth of their contents.  In their Renewed Motion to Dismiss, Defendants rely on information regarding sales, acquisitions and holdings of XL stock by the individual Defendants as set forth in the Forms 3, 4 and 5 filed with the SEC. (See Defs.' Mem. Supp. Ren. Mot. Dismiss 34-45.)  Defendants request that the Court take

---

[10]      Specifically, Plaintiffs quoted from and cited the transcripts in notes 10, 15, 17, 19, 20 and 39 and on pages 16-17, 20, 29-30, 34 and 47-48 of their Memorandum in Opposition to Defendants' Renewed Motion to Dismiss.  Plaintiffs' challenge to the accuracy and authenticity of the transcripts appears specious in light of their extensive reliance on the transcripts in their memorandum.

judicial notice of the contents of these SEC forms for the truth of the transactional data set forth therein.

XL's SEC documents, specifically SEC Forms 3, 4 and 5,[11] are referenced in the SAC and therefore are properly incorporated by reference. Indeed, Plaintiffs concede that SEC Forms 4 are incorporated into the SAC, (see Pl.'s Mem. Supp. Mot. Preclude 19), and previously conceded, in their Memorandum in Opposition to Defendants' original Motion to Dismiss, that they used the SEC Forms 4 to obtain the number of shares sold by each individual defendant in the SAC. (See Pl.'s Mem. Opp'n Mot. Dismiss 42, Mar. 31, 2006, Doc. No. 128.)

The Second Circuit has held that district courts may consider and take judicial notice of public disclosure documents required by law to be filed and actually filed with the SEC, such as XL's SEC Forms 3, 4 and 5, reasoning that:

> it is highly impractical and inconsistent with Fed. R. Evid. 201 to preclude a district court from considering such documents when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions. First, the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist. Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated. Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents. Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements. Finally, we believe that under such circumstances, a district

---

[11] SEC Form 3 (Initial Statement of Beneficial Ownership of Securities) is filed when a person first becomes required to report beneficial ownership. See 15 U.S.C. § 78p(a)(2)(A)-(B); 17 C.F.R. § 240.16a-3(a). Form 4 is used by directors, officers and those owning more than ten percent of any class of equity securities of a public company to report changes in beneficial ownership, as required by Section 16(a) of the 1934 Act. See 17 C.F.R. § 240.16a-3(a), (g). Form 5 is an annual statement of changes in beneficial ownership usable by some persons in compliance with Section 16(a) of the 1934 Act as an alternative to, or in addition to, Form 4. See id. § 240.16a-3(f).

> court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Kramer, 937 F.2d at 774. The Kramer court also held that district courts may take judicial notice of facts contained in "related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements." Id. The Kramer court did not squarely address the issue of whether documents required by law to be filed and actually filed with the SEC can be considered for the truth of their contents, stating both that such "documents . . . are relevant *not* to prove the truth of their contents but only to determine what the documents stated," and that "a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC." Id. (emphasis added). Moreover, in In re Merrill Lynch & Co. Research Reports Sec. Litig., 396 F. Supp. 2d at 356-67, discussed above, the court held that the types of documents that may be considered on a motion to dismiss include "public disclosure documents required by law to be, and that have been, filed with the [SEC]." 296 F. Supp. 2d at 356-57; see also Menowitz v. Brown, 991 F.2d 36, 39 (2d Cir. 1993) (holding that the district court could look at all federally mandated disclosure documents); In re Hunter Envtl. Servs., Inc. Sec. Litig., 921 F. Supp. at 918 (noting the Second Circuit's holding "that a court could view SEC filings even if the plaintiff did not specifically cite them in the complaint").

SEC Forms 3, 4 and 5, which are required to be filed with the SEC under penalty of perjury, are used by officers of public corporations to publicly disclose their transactions in company stock. These documents are routinely accepted by courts on motions to dismiss

securities fraud complaints and are considered for the truth of their contents. See, e.g., In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540-41 (3d Cir. 1999) (considering the Form 4 as evidence of how much stock was sold and how much stock the defendants continued to hold); In re Sina Corp. Sec. Litig., No. 05 Civ. 2154 (NRB), 2006 U.S. Dist. LEXIS 71089, at *37, 2006 WL 2742048, at *11 (S.D.N.Y. Sept. 26, 2006) (granting motion to dismiss while taking judicial notice of the defendants' filings with the SEC "to conclusively determine that the Individual Defendants' trading activity during the Class Period was not at all unusual when compared with their prior activity"); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (relying on the Forms 4 and 5 filed by the individual defendants, which recorded changes in beneficial ownership of the securities held, as evidence of the individual defendants' stock sales); In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d 358, 383 n.12 (E.D.N.Y. 2003) (relying on publicly filed records of the individual defendants' trading activity as evidence of how much stock was sold during the relevant time period)[12]; In re Vantive Corp. Sec. Litig., 110 F. Supp. 2d 1209, 1219 (N.D. Cal. 2000) ("In considering whether the stock sales are unusual or suspicious, the court may consider . . . SEC filings . . . ."), aff'd, 283 F.3d 1079 (9th Cir. 2002); Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 57 (E.D.N.Y. 1998) (considering SEC disclosure documents as evidence of stock transactions), aff'd, 189 F.3d 460 (2d Cir. 1999); In re Hunter Envtl. Servs., Inc. Sec. Litig., 921 F. Supp. at 917-919 (finding it proper to consider the defendant's relevant filings with the SEC).

---

[12] Although the court in In re KeySpan Corp. Sec. Litig. relied in part on the fact that the documents "clearly fall into the category of public disclosure documents that are required to be, and were, filed with the SEC," the court also noted that the plaintiff did not object to its consideration of those records. See 383 F. Supp. 2d at 383 n.12 (citing Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001)).

Under the PSLRA, Plaintiffs are required to show that Defendants acted with the requisite state of mind; i.e., that they possessed "an intent to deceive, manipulate or defraud." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001) (quoting <u>Ganino</u>, 228 F.3d at 161). To determine whether Defendants acted with the requisite scienter based on circumstantial evidence consisting of stock transactions, "the court must examine a variety of factors, including 'the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.'" <u>Frazier v. Vitalworks, Inc.</u>, 341 F. Supp. 2d 142, 160 (D. Conn. 2004) (quoting <u>In Re Scholastic Corp. Sec. Litig.</u>, 252 F.3d 63, 74-75 (2d Cir. 2001)). In order to make such a determination, the Court must review the trading data presented by either party, <u>see</u> <u>id.</u>, and the only source of that information is the Forms 3, 4 and 5 filed with the SEC.[13] As in the cases cited above, the Forms 3, 4 and 5 submitted to the SEC will be considered for the purpose of determining what statements the documents contain and as evidence of Defendants' stock transactions for the purpose of determining whether they acted with the requisite scienter.

**C.     S&P's Daily Stock Price Record**

Defendants submitted the Standard & Poor's Daily Stock Price Record as evidence of the market price of XL stock. It is clear that courts "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." <u>Ganino</u>, 228 F.3d at 167 n.8 (considering New York Stock Exchange data which was not attached to the complaint as an exhibit or incorporated by reference into the complaint); <u>Frazier</u>, 341 F. Supp. 2d at 162 n.9 ("The Court takes judicial notice of [] published stock prices"). Stock

---

[13]     Plaintiffs concede as much by admitting that their calculation of percentage of stock sold was based on SEC Form 4. (<u>See</u> Pls.' Mem. Opp'n Mot. Dismiss 42, Mar. 31, 2006, Doc. No. 128.)

price data published by S&P has been permitted on a motion to dismiss a securities fraud

complaint. See Flickinger v. Harold C. Brown & Co., 789 F. Supp. 616, 620 (W.D.N.Y. 1992);

Pryor v. USX Corp., No. 82 CIV. 0216 (KMW), 1991 WL 346368, *17 n.17 (S.D.N.Y. Nov. 27,

1991). The Court finds that the accuracy of the S&P Daily Stock Price Record is "not subject to

reasonable dispute," and as such, will take judicial notice of it.

## D. Charts & Graphs Summarizing Information

Plaintiffs argue that the summaries of information put together by Defendants, in the form

of graphs, charts and tabulations, are not judicially noticeable and should be stricken. Federal

Rule of Evidence 1006, however, provides that a party submitting "voluminous" data to a court

may present that data "in the form of a chart, summary, or calculation," so long as the originals or

duplicates of the originals are made available to the court. Fed. R. Evid. 1006; see also In re Sec.

Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 881-84 (S.D. Tex. 2001) ("Under Fed. R. Evid.

1006, [a] summary chart [summarizing information contained in SEC filings] may be included

because the underlying documents are also submitted for consideration by the Court and thus not

hearsay."). Plaintiffs argue that the summaries are misleading, but do not contend that they are

inaccurate. Because the underlying documents are also submitted for consideration, the

summaries, tables and charts will not be stricken from the record, however, the summaries will

not be considered without reference to underlying documents.

## IV. MOTION TO DISMISS

Plaintiffs' claims essentially rest on the allegation that Defendants knew, and

intentionally hid from investors, that XLRA's loss reserves were hundreds of millions of dollars

less than they needed to be to cover its exposure. Section 10(b) of the 1934 Act, 15 U.S.C. §

78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent

activities in connection with securities transactions.  Section 10(b) makes it unlawful

> to use or employ, in connection with the purchase or sale of any security . . ., any
> manipulative or deceptive device or contrivance in contravention of such rules and
> regulations as the Commission may prescribe as necessary or appropriate in the
> public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 specifies the behavior that Section 10(b) forbids, making it

unlawful "to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in light of circumstances under which they were

made, not misleading . . . ." 17 C.F.R. § 240.10b-5.  To state a valid cause of action under section

10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation (or omission); (2)

scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market

cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' i.e., a causal

connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo,

544 U.S. 336, 341-342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (internal citations omitted);

accord Lentell v. Merrill Lynch & Co., 396 F.3d at 172.  Defendants' motion to dismiss

challenges Plaintiffs' claims under the first and second prongs of this analysis.

A complaint alleging securities fraud under § 10(b) must also satisfy the heightened

pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.[14]  The Second

---

[14]    In 1995, Congress amended the 1934 Act through passage of the PSLRA. See Private Securities
Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k,
77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5).  The PSLRA was enacted in part "to curtail
the filing of meritless lawsuits" in an effort to extract large "nuisance" settlements, and as such,
imposes stringent procedural requirements on plaintiffs pursuing private securities fraud actions.
See H.R. Conf. Rep. No. 104-369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730.  The
PSLRA was also enacted in order to set "a uniform pleading standard for § 10(b) actions," as the

Circuit has interpreted Rule 9(b) to require that complaints "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Novak v. Kasaks</u>, 216 F.3d 300, 306 (2d Cir. 2000) (quotation marks and citations omitted). Similarly, the PSLRA requires that

> In any private action arising under this chapter in which the plaintiff alleges that the defendant –
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall *specify each statement* alleged to have been misleading, the *reason or reasons why the statement is misleading*, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall *state with particularity all facts on which that belief is formed*.

15 U.S.C. § 78u-4(b)(1) (emphasis added). With regard to the required element of scienter, the PSLRA requires a securities fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>Id</u>. § 78u-4(b)(2). "Read together, Rule 9(b) and the PSLRA mandate that 'plaintiffs must allege the first two elements of a securities fraud claim—fraudulent acts and scienter—with particularity.'" <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 213 F. Supp. 2d at 556 (quoting <u>Elliot Assoc. L.P. v. Hayes</u>, 141 F. Supp. 2d 344, 353 (S.D.N.Y. 2000)). Plaintiffs must satisfy *both* §§ 78u-4(b)(1) and (b)(2), otherwise, the SAC will be dismissed. <u>See</u> <u>id</u>. § 78u-4(b)(3)(A).

### A.    PSLRA § 78u-4(b)(1)

Courts of Appeals had diverged on the application of Rule 9(b) to securities fraud cases.

As set forth above, the PSLRA requires a securities fraud complaint to allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, with particularity sufficient facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).  The Second Circuit has ruled that contrary to the language of the statute, a securities fraud complaint need not plead with particularity "all" facts on which a plaintiff's beliefs regarding false or misleading statements are formed, but only "sufficient facts to support those beliefs." Novak, 216 F.3d at 313-14.[15] Plaintiffs allege, based on information and belief, that Defendants made false and misleading statements with regard to XL's failure to adequately reserve for losses in its NAC Re reinsurance operations—specifically, the steps the Company was taking to correct the problem of insufficient loss reserves and changes it was making to the method of estimating those reserves—in order to artificially inflate XL's stock price and maintain its high financial strength and debt ratings.[16]  In

---

[15]    The Novak court noted: "Paragraph (b)(1) is strangely drafted. Reading 'all' literally would produce illogical results that Congress cannot have intended. Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where 'all' the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted. Our reading of the provision focuses on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." 216 F.3d at 314 n.1.

[16]    All of Plaintiffs' allegations purport to be based on an investigation by counsel of various SEC filings, analyst reports, press releases, "relevant Company documents" and interviews with confidential witnesses.  For purposes of § 78u-4(b)(1), the phrase "investigation of counsel" is meaningless.  Because "no amount of investigation can transform information and belief—hearsay, essentially— into personal knowledge," In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 356 n.32 (S.D.N.Y. 2003), allegations based on the investigation of counsel are deemed to be made on "information and belief," and therefore are subject to § 78u-4(b)(1)'s particularity requirement. See id. ("for purposes of paragraph (b)(1), the phrase 'on investigation of counsel' is meaningless"); Feasby v. Industri-Matematik Intern. Corp., No. 99 Civ. 8761 LTS JCF, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003) ("Plaintiffs' argument that, because their allegations are based upon the 'investigation of counsel,' paragraph (b)(1)'s particularity requirement does not apply, is meritless.").

order to survive at this stage, the SAC must state with particularity sufficient facts to support the belief that Defendants knowingly and intentionally failed to properly reserve for the adverse loss developments at NAC Re and/or knowingly and intentionally failed to take steps to correct the problem, and accordingly that Defendants' positive public statements concerning the loss reserves were false and misleading.

Plaintiffs contend, based on their allegation that Defendants knew that NAC Re's loss reserves were insufficient, intentionally failed to properly reserve for the adverse loss developments and/or knowingly and intentionally failed to correct the problem, that Defendants' statements with regard to NAC Re's loss reserves during the Class Period were designed to artificially inflate the share price and maintain the Company's ratings in order to grow the Company's business, avert payment of debt, allow the Individual Defendants to sell their stock at inflated prices, and collect large incentive bonuses.

Plaintiffs have compiled a long list of allegedly false and misleading statements made by Defendants during the almost two-year Class Period in order to accomplish these goals. These statements were made in conference calls, press releases, XL's financial statements and documents filed with the SEC. They pertain to matters such as the Company's methodology of calculating loss reserves and the sufficiency of those reserves, the frequency and intensity with which the Company conducts claims audits, management's expectations with regard to the reinsurance market and XL's share price, the Company's assets and ratings, and other general business projections. Plaintiffs have identified the speakers of the statements as well as the time frames and venues in which they were made. Accordingly, Plaintiffs have satisfied the Rule 9(b) requirement that the SAC allege the "time, place, speaker, and . . . content of the alleged

misrepresentation." Shields v. Citytrust Bancorp., 25 F.3d 1124, 1129 (2d Cir. 1994); accord

Novak, 216 F.3d at 306.  Accordingly, the Court must determine whether the SAC adequately

explains "why the statements were fraudulent." Novak, 216 F.3d at 306.

With regard to the methodology of estimating loss reserves, the December 31, 2000

Report on Form 10-K (prior to the start of the Class Period), stated that "[t]he methodology of

estimating loss reserves is periodically reviewed to ensure that the assumptions made continue to

be appropriate and any adjustments resulting therefrom are reflected in income of the year in

which the adjustments are made."  Similarly, XL's April 6, 2001 and April 6, 2002 proxy

statements explain that "[t]he Audit Committee reviews the Company's reserving methodology

and reserves."  With regard to claims audits, the December 31, 2000 and December 31, 2001

Reports on Form 10-K state that "claims audits are conducted for specific claims and claims

procedures at the offices of selected ceding companies."  In the Form 10-K for the period ending

December 31, 2001, the Company also stated that "[u]nderwriting and loss experience is

reviewed regularly for loss trends, emerging exposures, changes in the regulatory or legal

environment as well as the efficacy of policy terms and conditions," and asserted that it "believes

the methods presently adopted [for estimating loss reserves] provide a reasonably objective result

as it is based upon the Company's loss data rather than more theoretical models often used in the

low frequency high layer business the Company underwrites."

At a conference held on January 29, 2002, Defendant O'Hara spoke about the Company,

saying that XL has "a tremendous track-record of claims handling."  Later, O'Hara asserted that

XL "conduct[s] a full actuarial review of all our business units annually."  With regard to the loss

reserve increases, O'Hara stated that the Company was, at the time, "in very good shape,"

explaining that XL's "problems reflect what every reinsurer faced. We have put it behind us, and all the other actuarial reviews checked out positively."

Management also expressed their opinion with regard to the sufficiency of XLRA's loss reserves, stating in the December 31, 2000 Report on Form 10-K (prior to the start of the Class Period), that they "believe[] that the reserves for unpaid losses and loss expenses are sufficient to pay losses that fall within coverages assumed by the Company." In a July 31, 2002 conference call, held five months after the Company announced a $180 million reserve increase for the fourth quarter of 2001, Defendant CEO O'Hara stated, "Now to address the outlook. . . . The adjustment for losses on WTC behind us, diminished exposure to asbestos, efficient [sufficient] reserves and a double a-rated balance sheet, I believe we are in an unencumbered position to move forward." Subsequent to this statement, as noted above, the Company took an additional $1.062 billion in loss reserves, announcing a $215 million increase on February 11, 2003, a $184 million increase on October 17, 2003, and a $663 million increase for the fourth quarter of 2003. As late as August 1, 2003, O'Hara had reiterated his prior growth forecast for XL for 2003 in the range of $8 per share. In a press release issued on October 17, 2003 announcing the $184 million reserve increase, Defendant CEO O'Hara assured investors that he was going to be "personally leading a review of this book of business, which will include an intensive claims audit and review of the ceding company claims files that will be completed by year end," and intended to "fully address our exposure to the 1997 through 2000 North American casualty reinsurance book written by the former NAC Re so that it will not adversely affect our financial results in 2004 and beyond." After the Class Period and as a result of the "intensive claims audit" and reserve review described to investors, the Company announced the additional $663 million reserve

increase on January 13, 2004. All of the reserve increases were described by the Company as stemming from adverse developments in the North American reinsurance operations, NAC Re, for the 1997 through 2000 accident years.

Plaintiffs' claims that these statements were false and misleading are based primarily on the reports of confidential witnesses, a report issued by the New York Insurance Department, and Plaintiffs' assumptions regarding what the Individual Defendants knew or should have known with regard to the loss reserves.

### 1. Confidential Witnesses

Plaintiffs' allegations of scienter are based in part on their discussions with four confidential witnesses. Reliance on confidential witnesses is not inappropriate at the pleading stage; however, those sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314. Sources also need not be named if the other facts relied on by Plaintiffs "provide an adequate basis for believing that the defendants' statements were false." Id. Of the four confidential witnesses discussed in the SAC, only one—CW1—is alleged to have worked at XLRA during the Class Period. CW2 and CW3 are not alleged to have worked at XLRA at all, and CW4 is alleged to have left XLRA prior to the start of the Class Period.

CW1 is alleged to have been a facultative analyst in XL's NAC Re reinsurance operations from 2001 to 2004, supporting XL's Accounting, Claims and Underwriting based at its Stamford, Connecticut headquarters. In his or her capacity as a facultative analyst, CW1 served as a liaison between NAC Re's accounting department and the direct insurers. CW1's responsibilities

24

included receiving and reviewing reports sent from direct carriers identifying batches of claims paid and seeking reimbursement for portions of liability assumed by NAC Re, communicating with direct insurers to verify claims paid on liability assumed by NAC Re, determining whether policies written in fact covered the losses claimed, verifying that ceding companies had actually made their premium payments on policies ceded to NAC Re, and interfacing the direct insurers and NAC Re's accounting department regarding claims made and claims paid.

According to CW1, NAC Re had "serious accounting problems" prior to XL's acquisition of the company in 1999 that were not resolved after the merger. CW1 reported that the accounting system was unreliable, and said that when he or she began working at NAC Re in 2001, there was a backlog of thousands of claims which had been submitted from the ceding companies over a period from 1997 through 2001, but which had not yet been paid by NAC Re. Apparently, the bulk of CW1's daily responsibilities involved reconciling NAC Re cedant payments and NAC Re's payment liabilities on claims for years prior to 2001 because NAC Re's accounting department was unable to reconcile, through its accounting system, whether claims had been paid. With regard to the accounting system's unreliability and disorganization, CW1 reported that claims submitted by ceding companies were, at times, not paid even though NAC Re had erroneously represented that they were paid, and that the records of payments on reported claims were often incomplete, with some claims being left unpaid for years. CW1 further reported that these record-keeping issues impacted NAC Re's ability to collect premiums from the ceding companies, as the accounting department often had "no record whatsoever" or lost track of payments.

CW1 further reported that direct insurance brokers and direct insurance company

customers "regularly" complained to the underwriters or facultative analysts, including CW1, about NAC Re's failure to reimburse them, and consequently, NAC Re was involved in "many" disputes with ceding companies over whether NAC Re had paid claims. According to CW1, these disputes were a direct result of NAC Re's poor accounting system and the fact that records were "so poorly kept."[17]

CW1 reported to Plaintiffs' counsel that the accounting problems at NAC Re were "well known" to XL's management team in Stamford, however, the only asserted basis for this knowledge is CW1's report that the information regarding claims that he or she collected and assembled from cedant companies was sent directly to XL's Vice President of Claims for NAC Re, David Hughes, in XL's Stamford headquarters. CW1 also reported that among direct insurers and brokers at other insurance companies, the NAC Re accounting department was considered a "joke and an embarrassment."

CW2 is a former Senior Vice President of XL Insurance who worked at the Company's Bermuda headquarters. He was responsible for managing direct insurance business, rather than reinsurance, for coverage of liability, property and professional liability. CW2 did not work at XLRA. According to CW2, XL "did not do the due diligence that needed to be done" when it acquired NAC Re in 1999, and "did not look a heck of a lot" at NAC Re's claims history.

---

[17] CW1 also reported that he was told by unnamed "superiors" that "accounting wanted [the underwriters and facultative analysts] to handle the problems because the accounting system was messed up." Moreover, CW1 claims that between 2001 and 2004, NAC Re's accounting personnel in Stamford occasionally reported to CW1 and his or her superiors that XLRA's reserves were exhausted and there was no money to pay the claims owed. These claims, however, are based on impermissible hearsay and cannot be considered. See Zucco Partners, LLC v. Digimarc Corp., 445 F. Supp. 2d 1201, 1207 (D. Or. 2006) ("These allegations are based on hearsay and, therefore, do not meet the PSLRA requirement that confidential witnesses' allegations must be based on personal knowledge.").

Specifically, CW2 reported to Plaintiffs' counsel that XL's due diligence process for the NAC Re acquisition did not consist of a detailed review of claims within NAC Re or communications with the direct insurers (ceding companies) from which NAC Re assumed liabilities. CW2 alleges that XL's actuaries used NAC Re's loss data—or "loss runs"—at the time of the acquisition and that XL based its actuarial computations for setting reserves on the data provided by NAC Re, but that NAC Re's claims data was not fully tested, i.e., reviewed at the claims level from the ceding companies. According to CW2, in the context of acquisitions in the reinsurance industry, "it is known" that loss data is often incomplete, resulting in a "bad base" upon which actuarial analysis can be performed in order to set reserves for future losses.

CW3 was a Vice President of Finance of XL Insurance and XL America, Inc. in Stamford, Connecticut and was responsible for writing direct insurance policies before leaving in 2001, prior to the start of the Class Period. Like CW2, CW3 did not work at XLRA. Prior to working for XL Insurance, CW3 worked for Intercargo Insurance as Vice President of Finance for a few years before it was acquired by XL Insurance. CW3 reported to Plaintiffs' counsel that while working at Intercargo, he was aware of faulty record-keeping on the part of NAC Re. According to CW3, Intercargo shared liability on a number of policies with NAC Re, and there were "always problems" in dealing with NAC Re when attempting to get reimbursements for claims payments fronted by Intercargo. CW3 apparently related to Plaintiffs' counsel "many disputes" between Intercargo and NAC Re over whether NAC Re had been paid (ceded) premiums that it showed no record of having received or whether NAC Re had reimbursed Intercargo for claims fronted by it, however, Intercargo was able to prove, by producing records of reimbursements for claims payments and other information, to XL that it had made the

requisite payments to NAC Re. According to CW3, "any carrier who did business with [NAC Re]" knew of its accounting deficiencies.

CW4 is a former Assistant Vice President, Internal Consultant at NAC Re, employed in the IT segment of operations responsible for various internal IT projects and system upgrades. CW4 worked at NAC Re for over six years, but left in 2000, prior to the start of the Class Period. According to CW4, from the time of the NAC Re acquisition in 1999 until he or she left the Company in 2000, there was no effort to integrate NAC Re's accounting system into XL.

Both CW1 and CW3 make general, unsupported allegations that NAC Re's alleged accounting deficiencies were "well known" in the industry. It is well-established, however, that "[g]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1)." Cal. Pub. Emples.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 155 (3d Cir. 2004); see also In re Vertex Pharms., Inc., Sec. Litig., 357 F. Supp. 2d 343, 354 (D. Mass. 2005) ("Mere rumors cannot reasonably satisfy the requirement that the facts alleged provide an adequate basis for believing that the defendants' statements were false.") (internal quotation marks and citation omitted); Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004) (holding that the plaintiff's allegations, based on confidential witness reports, that information was "'known' or 'common knowledge' within the Company" were too vague and conclusory to support a finding that the defendants knew or were severely reckless in not knowing that they were making false statements). Therefore, the allegations that the accounting problems at NAC Re were "well known" to XL's management team in Stamford; that among direct insurers and brokers at other insurance companies, the NAC Re accounting department was considered a "joke and an

28

embarrassment;" and that "any carrier who did business with [NAC Re]" knew of its accounting

deficiencies are not sufficient to satisfy § 78u-4(b)(1). CW3's allegations regarding Intercargo's

experiences with NAC Re are problematic in two respects. First, the allegations pertain to the

time period before the Class Period, and there is no allegation that these problems continued into

the Class Period. Second, there is no allegation that these alleged problems affected loss reserves

or were known to Defendants.

The only evidence going to Defendants' knowledge of the alleged accounting problems at

XLRA is CW1's report that information regarding claims that he or she collected and assembled

from ceding companies was sent directly to XL's Vice President of Claims for NAC Re, David

Hughes, in XL's Stamford headquarters. David Hughes, however, is not a defendant, and is not

alleged to have communicated information to any of the Individual Defendants. Moreover, there

is no evidence that the information communicated from CW1 contained any information

regarding the alleged accounting deficiencies at NAC Re or any indication that the Company had

not set aside sufficient loss reserves. The existence of one line of communication between CW1

and a non-defendant officer at XL's Stamford headquarters is not sufficient to support a theory of

scienter based upon knowledge or reckless conduct on the part of the Individual Defendants. See

Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 522-23 (S.D.N.Y.), aff'd, 157 Fed. Appx. 398

(2d Cir. 2005) (finding a confidential witness's report that internal channels of communication

existed insufficient to support a finding of scienter, holding that "the existence of channels is not

enough" without "evidence of what information was actually passed through these channels,"

and refusing to "accept that the existence of an internal communication network, in and of itself,

sufficiently supports a theory of scienter based upon reckless conduct in the context of specific

information at a specific time"). Moreover, none of the CWs present any evidence that they communicated any of the alleged problems detailed above to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues. See Druskin, 299 F. Supp. 2d at 1333 (finding the confidential witness reports insufficient to support a finding of scienter because, *inter alia*, they did not "specifically allege that they 'told' any Defendant" the relevant information, "only that it was 'generally known'—that is not sufficient"). As the Fadem court noted, "[i]t is doubtful, at best, that such a former employee is in a position to predict (he cannot know) what was said or unsaid by whom and to whom" regarding the information in question. 352 F. Supp. 2d at 523.

Also problematic is the fact that none of the CWs are alleged to have been involved in or to have any familiarity with the process of setting or estimating loss reserves. See In re Trex Co., Inc. Sec. Litig., 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) ("the plaintiffs must sufficiently allege that the confidential witness was in a position to know the facts related"). CW1 reported that there were thousands of backlogged claims, but Plaintiffs do not allege that the backlogged claims payments were the subject of reinsurance reserve increases. According to Defendants, these reserve increases arose "primarily from *new* casualty claims for the 1997 to 2000 underwriting years." (Def.'s Reply 1-2; SAC ¶¶ 177, 232.) Finally, the bulk of the information relayed by the CWs relates to the time prior to the start of the Class Period in 2001. For example, the allegation regarding thousands of backlogged claims payments relates to the time "when CW1 began working at NAC Re in 2001," (see SAC ¶ 73); CW2's allegation regarding the lack of due diligence relates to the acquisition of NAC Re in 1999; and CW3 and CW4 left in 2001 and 2000 respectively, both prior to the start of the Class Period. Plaintiffs do not allege

30

and produce no evidence to show that the situations and problems described continued through the class period. Cf. Chubb Corp., 394 F.3d at 154 ("Plaintiffs do not allege that this former vice president was employed at the appropriate time.").

For the reasons detailed above, the information collected from the CWs, although substantial in amount, is inadequate substantively to support an inference of scienter on the part of any of the defendants. See Chubb Corp., 394 F.3d at 155 ("Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA."). Although the CW accounts are sufficient to establish accounting and management problems at XLRA, there is no evidence that Defendants were aware of these problems. As set forth more fully below, accounting deficiencies, without more, do not violate the PSLRA. See Novak, 216 F.3d at 309 ("allegations of allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim) (internal citations omitted).

### 2. NYID Report

The SAC alleges that the CW reports and "the impact of the Company's lack of internal controls" are "confirmed by" the "scathing" NYID Report. (SAC ¶¶ 84, 117-123.) In that Report, the NYID made findings regarding the Company's accounting deficiencies, violations of New York Insurance Law, and understatement of loss reserves. The NYID Report found, *inter alia*, that NAC Re had failed to have several ceded reinsurance contracts signed within nine months of their effective dates, that some of the reinsurance contracts for which NAC Re had taken credit did not have executed interest and liability pages or had not been reduced to writing, that NAC Re was not in compliance with Section 1308(a) of the New York Insurance Law which

requires contracts to contain an insolvency clause in order to take credit for the reinsurance, that several amounts reported by NAC Re in its filed annual statement could not be supported by internal records, that some of the annual statement balances in cash and payable for securities were incorrectly classified, that NAC Re did not have support for three of the annual statement balances, including reinsurance payable on paid losses & loss adjustment expenses, and that there was a discrepancy in two of the four balances tested during the NYID's review of reinsurance payable on paid losses & loss adjustment expenses. (See NYID Report 12-13, 17-19, Ex. 2 to SAC.) For these violations, however, the NYID found that the amounts involved were immaterial. No examination changes were made to the financial statements; the NYID simply recommended that the Company rectify these problems going forward and comply with the rules in the future. (Id. at 13.)

Although these accounting deficiencies are problematic, the Report, on its own, is insufficient to give rise to an inference of scienter. The Report is "as of" December 31, 1999, and there is no allegation or evidence that these problems continued into or during the Class Period. The Report indicates that the Company had resolved the problems noted in the prior NYID Report, and there is nothing to suggest that they would not have acted similarly after this Report. Moreover, the Report was not issued until May of 2002, and there is no evidence that any Defendant was aware of the contents of the Report prior to its publication. Finally, although the Report, like some of the confidential witnesses, refers to accounting deficiencies at the Company, the Report indicates that the amounts involved were "immaterial," and Plaintiffs have not supplied any evidence linking these deficiencies to NAC Re's inadequate loss reserves.

More pertinent to this motion, the NYID also found that the Company had, as of

December 31, 1999, understated loss reserves by $189 million:

> The examination liability of $1,175,734,849 is $189,000,000 more than the $986,734,849 reported by the Company as of December 31, 1999. The examination analysis was conducted in accordance with generally accepted actuarial principles and practices and was based on statistical information contained in the Company's internal records and in its filed annual statements. The $189,000,000 increase is based on the Company's subsequent two year loss development at December 31, 2001.

(Id. at 25.) Plaintiffs contend that the $189 million deficiency in XL's loss reserves was as of December 31, 2001. Although the Report states that the increase is "based on the Company's subsequent two year loss development at December 31, 2001," it used the examination liability amount as reported by XL on December 31, 1999. It appears, therefore, that the NYID found a $189 million reserve deficiency as of December 31, 1999 based on the loss patterns that developed in the subsequent two years, leading to the conclusion, in 2001, that the examination liability as of 1999 was understated. The Report itself was "as of December 31, 1999," and therefore did not address subsequent financial statements. Presumably then, the $122 million increase taken by the Company in the fourth quarter of 2000 would have, in large measure, alleviated this deficiency. In any event, the $180 million increase taken in the fourth quarter of 2001 certainly did.

Plaintiffs argue that XL's February 12, 2002 announcement that it would increase NAC Re's loss reserves by $180 million for the 1997 to 1999 underwriting years was in direct response to the NYID's findings, contending that the NYID Report put Defendants on notice of the flaws in NAC Re's accounting and the problems associated with the 1997-1999 underwriting years.[18]

---

[18] Plaintiff makes this argument for the first time in its Memorandum in Opposition to Defendants' Motion to Dismiss; the claim is not raised in the SAC. Nonetheless, the Court will address it here.

(See Pls.' Mem. Opp'n Mot. Dismiss 2-3.) Plaintiffs admit, however, that Defendants announced the $180 million increase on February 12, 2002, three and a half months before the report was published on May 31, 2002. Moreover, as discussed above, Defendants also took a $122 million increase in the fourth quarter of 2000. Plaintiffs concede that there is no evidence that Defendants were aware of the contents of the NYID Report prior to its publication. (See SAC ¶ 261 ("XL knew no later than May 2002 (and probably much earlier), that the NYID had concluded that XL lacked adequate internal controls over its NAC Re reinsurance operations, and that NYID found it necessary to make a $189 million adjustment to increase loss reserves beyond what NAC Re reported to NYID as of December 31, 1999.").) Accordingly, the NYID's finding that the loss reserves were only understated by $189 million actually bolsters Defendants' position. The NYID's analysis was performed according to generally accepted actuarial principles and practices and was based on statistical information contained in the Company's internal records and in its filed annual statements. (See NYID Report 25.) Before the Report was released, Defendants had already found the loss reserves to be understated and acted accordingly, announcing a $122 million loss reserve increase in the fourth quarter of 2000 and a $180 million increase for the fourth quarter of 2001. The Report indicates that NYID's suggested $189 million increase was based on the Company's two-year loss development patterns as of December 31, 2001, suggesting that such an increase was not apparent as of December 31, 1999. Moreover, the NYID, like Defendants, also failed to anticipate the subsequent reserve strengthenings of $215 million for the fourth quarter of 2002, $184 million for the third quarter of 2003, and $663 million for the fourth quarter of 2003. This undermines Plaintiffs' argument that Defendants were not complying with Generally Accepted Accounting Principles ("GAAP")

or were otherwise engaged in fraud in connection with estimating the Company's loss reserves.

3.   Allegedly False or Misleading Statements

_a.   Statements of Opinion_

Plaintiffs have not produced any evidence showing that Defendants knew that NAC Re's loss reserves were insufficient, intentionally failed to properly reserve for the adverse loss developments at NAC Re, or knowingly and intentionally failed to take steps to correct the problem once it became apparent.  The majority of the statements at issue are statements of opinion, and do not veer beyond cautious optimism.  The language used by Defendants—e.g., XL "_believes_" the reserves are sufficient, "we _think_ we've turned a corner now," "I _believe_ we are in an unencumbered position to move forward," "we _believe_, _given all the facts we know today_, it is at the right reserve levels," and the Company "_believes_ the methods presently adopted [for estimating loss reserves] provide a _reasonably_ objective result"—qualifies the statements and indicates their status as opinions, rather than guarantees. Optimistic statements concerning the future of a company are generally referred to as "statements of opinion and puffery," and as such, are "not actionable as a matter of law." In re DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d 562, 568-69 (S.D.N.Y. 2007) (statements that a company has a "strong balance sheet" are "more properly characterized as optimistic statements of opinion as opposed to fact"); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d at 557 ("a complaint alleging violations of the securities laws may not rely upon statements that . . . constitute puffery or ordinary expressions of corporate optimism"); see also Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (a company is "not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the

prospects of business that they manage"); City of Sterling Heights Police & Fire Ret. Sys. v.

Abbey Nat'l, PLC, 423 F. Supp. 2d 348, 358 (S.D.N.Y. 2006) (statements in SEC filings such as

"Wholesale Banking is in very good shape as it moves into its next stage of development," found

to be "inactionable as general statements of optimism"). Opinion statements are actionable,

however, "if Plaintiffs can plead 'with particularity that defendants did not sincerely believe the

opinion they purported to hold,'" In re DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d at 569

(quoting Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004)), or if

"they are worded as guarantees or are supported by specific statements of fact." In re Bristol-

Myers Squibb Sec. Litig., 312 F. Supp. 2d at 557 (quoting In re IBM Corp. Sec. Litig., 163 F.3d

102, 107 (2d Cir. 1998)). In analyzing whether Defendants' statements regarding the sufficiency

of the Company's reserves were not "sincerely held opinions and thus actionable

misrepresentations, the 'material misrepresentation' requirement for pleading fraud essentially

collapses into the scienter requirement." In re DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d at 569.

As the Podany court explained:

> While in a misstatement of fact case the falsity and scienter requirements present
> separate inquiries, in false statement of opinion cases . . . the falsity and scienter
> requirements are essentially identical. That is because a material misstatement of *fact*
> is alleged by pointing to the true fact about the world that contradicts the
> misstatement. But even if the statement of fact ("the company made x million dollars
> in profit last year") turns out to be objectively false, it could have been made in good
> faith; subjective intent to commit fraud is a wholly separate inquiry from whether the
> statement is objectively true. However, a material misstatement of *opinion* is by its
> nature a false statement, not about the objective world, but about the defendant's own
> belief. Essentially, proving the falsity of the statement "I believe this investment is
> sound" is the same as proving scienter, since the statement (unlike a statement of
> fact) cannot be false at all unless the speaker is knowingly misstating his truly held
> opinion. As with all inquiries into someone's state of mind, plaintiffs must typically
> rely on circumstantial evidence for the defendants' words and actions.

318 F. Supp. 2d at 154 (emphasis in original).

No reasonable investor reading these statements would view them as guarantees that XL's loss reserves were sufficient; the statements are properly characterized as non-actionable statements of opinion. In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d at 558. The question of whether the statements were "sincerely held opinions" will be examined in the next section's scienter analysis.

Also at issue are O'Hara's statements during the January 29, 2002 Salomon Smith Barney conference that the Company was, at that time, "in very good shape," explaining that XL's "problems reflect what every reinsurer faced. We have put it behind us, and all the other actuarial reviews checked out positively." There is no showing that O'Hara believed these statements to be false when made, as set out in more detail in the next section. Moreover, these statements are generally not actionable as a general statement of optimism. See Rombach, 355 F.3d at 174; City of Sterling Heights, 423 F. Supp. 2d at 358.

<em>b.    Statements of Fact</em>

The statements regarding XL's accounting practices—including, *inter alia*, that the methodology of estimating loss reserves is periodically reviewed, the Audit Committee reviews the Company's reserving methodology and reserves, claims audits are conducted for specific claims and claims procedures at the offices of selected ceding companies, and underwriting and loss experience is reviewed regularly—are statements of fact, however, Plaintiffs do not allege with particularity why these statements were fraudulent. Plaintiffs simply list the statements and assert that because large reserve increases were necessary, the accounting practices described must not have been followed. (See Pls.' Mem. Opp'n Mot. Dismiss 33-34 (stating that "the fact that XL paid $1.2 billion [in acquiring NAC RE] and has taken $1.6 billion in reserve increases

further demonstrates that their own actuarial and accounting policies were not followed").) This conclusory allegation, however, is insufficient. The Second Circuit has noted more than once that the pleading technique employed here, which "couple[s] a factual statement with a conclusory allegation of fraudulent intent," is insufficient to "support the inference that the defendants acted recklessly or with fraudulent intent." Rombach, 355 F.3d at 176 (quoting Shields, 25 F.3d at 1129). As in Rombach, Plaintiffs here fail to "allege facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements." 355 F.3d at 176.

The only other evidence Plaintiffs rely on to show that these policies were not followed is CW2's report that XL assumed NAC Re's reinsurance obligations in acquiring NAC RE in 1999 without adequate due diligence. There is no evidence, however, that Defendants' statements about the Company's accounting procedures were false or that they were not followed. The fact that XL acquired NAC Re without adequate due diligence, although not a sound business decision, does not establish the falsity of the statements set forth above. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 479, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); Rothman, 220 F.3d at 90 ("Generally, poor business judgment is not actionable under section 10(b) and Rule 10b-5."). Neither does the fact that XL was required to increase loss reserves during the Class Period. As discussed herein, the process of estimating loss reserves is a difficult one, and even following these accounting policies might not result in adequate loss reserves. It is clear, however, the Plaintiffs must provide evidence of fraud, aside from the mere fact of the loss reserve increases, to prevail on their claims. As Judge Easterbrook

38

explained in <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624 (7th Cir.), <u>cert. denied</u>, 498 U.S. 941, 112 L. Ed. 2d 312, 111 S. Ct. 347 (1990):

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

<u>Id</u>.

Plaintiffs argue that if Defendants had conducted claims audits at its ceding companies, as represented to investors, Defendants would have discovered the claims data had already been reported and would have enabled XL to set adequate loss reserves, as required by GAAP. (SAC ¶¶ 71-85, 94.) Plaintiffs argue therefore, that Defendants' statements that XL conducted claims audits at its ceding companies, (<u>see</u> SAC ¶¶ 67, 91, 107, 130), was false. Defendants' SEC filings stated only that "claims audits are conducted for *specific* claims and claims procedures at the offices of *selected* ceding companies." (SAC ¶¶ 67, 107) (emphasis added). Plaintiffs have not alleged and cannot show that this did not occur. Defendants did not state that claims audits were conducted for all claims at all ceding companies, but only for *specific* claims at *selected* ceding companies. Given this qualifying language, there is nothing to show that this statement is false.

Moreover, GAAP does not require that a reinsurance company engage in extensive reviews of its cedants. Indeed, because of the speculative nature of the loss reserve process, GAAP requires only that reinsurers make a "reasonable estimate" of IBNR liabilities. <u>Delta Holdings v. National Distillers & Chem. Corp.</u>, 945 F.2d 1226, 1229 (2d Cir. 1991) ("GAAP

neither specifies a precise actuarial method [of estimating loss reserves] nor requires that the reinsurer retain an independent actuary to prepare or review loss reserve estimates.").  As set forth in <u>Delta Holdings</u>, "IBRN reserves . . . are . . . conjectural because they must be calculated without knowing even the number of claims." <u>Id</u>. at 1231.  Reinsurance companies generally cannot compensate for this uncertainty by using overly conservative loss estimates: "[o]verestimated harmful because reinsurance premiums are competitive and a competitive return on investment is necessary to attract investors. Methods that cause substantial excess reserves to be set aside may cause losses to a reinsurer for lack of underwriting or investment." <u>Id</u>.  Although reliable historical data is necessary to estimate reserves, "in the reinsurance industry history may be an imperfect guide to the future, particularly with regard to casualty risks." <u>Id</u>.  Even the "conservative" Bornhuetter-Ferguson Method, developed by one of the defendants here, "relies on assumptions as to future events and conditions, that, if wrong, will lead to substantial errors in the final estimate." <u>Id</u>. "Consequently, regardless of the actuarial method used, the preparation of, and reliance upon a net worth calculation in a balance sheet for a casualty risk reinsurer is based in large part upon informed guesswork. One cannot, therefore, expect equivalent certainty in a balance sheet's statement of loss reserves and its statement of more determinable items . . . ." <u>Id</u>.

Plaintiffs make a similar argument with regard to Defendant O'Hara's statement at the January 29, 2002 Salomon Smith Barney conference, where he represented that "[w]e conduct a full actuarial review of all our business units annually." (SAC ¶ 91.)  Defendant O'Hara is not, as Plaintiffs allege, claiming that XLRA conducts a "full actuarial review" of all of *its* business annually (referring to XLRA's cedents), but is stating that XL, XLRA's parent company,

conducts a full actuarial review of all *our* business units annually, referring to XL's operating subsidiaries. There is no allegation that this statement, read correctly, is false, nor would it lead a reasonable investor to believe that XL conducted a full actuarial review of all of XLRA's cedants annually. See In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) (finding a statement not actionable where it "would not have misled a reasonable investor).

O'Hara's other statement from the January 29, 2002 Salomon Smith Barney conference can also be characterized as a statement of fact. However, O'Hara's statement that XL has "a tremendous track-record of claims handling," was made in the context of XL's "core casualty business" of insurance, not with reference to the reinsurance operations. (See Transcript 261, Jan. 29, 2002, Tab 5 to Stapleton Decl.) Indeed, the statement only makes sense if it is referring to the insurance business, as it is the cedent, not the reinsurer, which handles insureds' claims in the reinsurance business. Therefore, this statement is also not actionable.

Plaintiffs also allege that Defendants falsely stated that XL had sufficient credit support when they knew that XL did not have sufficient credit. On June 18, 2003, Defendants filed an amended quarterly Report on Form 10-Q with the SEC, stating:

> In addition to letters of credit, the Company has established insurance trusts in the U.S. that provide cedants with statutory relief under state insurance regulations in the U.S. It is anticipated that the commercial facilities will be renewed on expiry but such renewals are subject to the availability of credit from banks utilized by the Company. In the event that such credit support is insufficient, the Company could be required to provide alternative security to cedant. This could take the form of additional insurance trusts . . . .

(SAC ¶ 164.) Plaintiffs allege that Defendants' statement that "in the event that such credit support is insufficient, the Company could be required to provide alternative security" was false and misleading when made, based on their conclusory allegation that, "as early as May 22, 2003,

41

XL had already set up" such a trust. (Id. ¶ 165.)  Plaintiffs, however, fail to allege with

particularity that such a trust had been established or that any of the Individual Defendants knew

of such a trust.  Moreover, even if the allegations regarding the trust were sufficient, the fact that

it had been set up does not mean that Defendants' statement was false and misleading.  The trust

could have been set up in an abundance of caution or for other reasons.  According to

Defendants, the Mangrove Trust and ancillary agreements were established as a means of

collateralizing XL Re Bermuda's obligations to XLRA arising out of the cession of the increased

reserves under the quota share reinsurance agreement between them, as required by New York

Insurance Law.  This transaction took place after and in reaction to the reserve increases, and no

inference should or can be drawn that the transaction reflected prior knowledge of future reserve

deficiencies at XLRA.  Accordingly, no inference of scienter can be drawn from the existence of

the trust or from Defendants' statements set forth above.

Finally , although "misreported financial data are clearly false statements of fact," In re

DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d at 569, in this case, unlike In re DRDGold, there is no

allegation here there has been any restatement of any financial statement or that any auditor or

actuary has qualified or withdrawn its opinion. See Druskin, 299 F. Supp. 2d at 1325-26 & n.27

(noting the absence of allegations that the company's financial results were restated); In re

DRDGold Sec. Litig., 472 F. Supp. 2d at 569 (holding that restatement is a sufficient basis for

pleading that those statements were false when made).  Moreover, Plaintiffs do not allege any

other indicator that the results reported by Defendants were inaccurate at the time reported, or

that Defendants had knowledge of any inaccuracy.  Plaintiffs must do more than allege that

Defendants could not have actually believed that loan loss reserves were adequate because they

later increased reserves. See Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105, 116 (D. Conn. 2005) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."); In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d at 690-91 ("That defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective. "); Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (dismissing Rule 10b-5 claim in which plaintiff simply pointed to later disclosures as evidence of misstatements in the original disclosures). In Novak, the Second Circuit explained:

> [w]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.

216 F.3d at 309 (internal citations omitted).

With regard to Defendants' statements of fact, Plaintiffs have failed to allege with particularity that those statements were false when made. Accordingly, Plaintiffs have failed to meet the first prong of the PSLRA analysis with regard to Defendants' statements of fact. Because Plaintiffs have also alleged that Defendants made various opinion statements, however, the Court will go on to examine whether Plaintiffs have adequately alleged scienter.

### B.    PSLRA § 78u-4(b)(2)

The PSLRA also requires a securities fraud complaint, "with respect to each act or omission alleged to violate" the PSLRA, to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The

Supreme Court recently addressed this scienter requirement and raised the bar for securities fraud actions, holding that a court examining whether a complaint's scienter allegations can survive threshold inspection for sufficiency under the PSLRA "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also [plausible] competing inferences rationally drawn from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. ___, No. 06-484, slip op. at 2, 2007 U.S. LEXIS 8270, at *11 (June 21, 2007). To qualify as "strong" within the meaning of § 78u-4(b)(2), the inference of scienter alleged by Plaintiffs "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 2, *12. The Tellabs Court elaborated on this requirement:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." Recall in this regard that § [78u-4(b)]'s pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

Id. at 12, *29-30 (internal citations omitted). In sum, lower courts, accepting the allegations in the complaint as true and taking them collectively, should deny a motion to dismiss and uphold a securities fraud complaint "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 12-13, 14, *30, *32.

The Second Circuit has previously held that to establish the requisite "strong inference of

fraudulent intent," securities fraud plaintiffs must either (1) demonstrate "that defendants had both motive and opportunity to commit fraud," or (b) allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit, 264 F.3d at 138-39. The Second Circuit has made clear that conclusory allegations are insufficient to establish scienter under PSLRA § 78u-4(b)(2), holding that "a 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.'" Rombach, 355 F.3d at 176-177 (quoting Shields, 25 F.3d at 1129) (brackets in original).

> 1.    Motive and Opportunity

"In alleging motive and opportunity, plaintiffs must demonstrate the presence of 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged' as well as 'the means and likely prospect of achieving concrete benefits by the means alleged.'" In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (quoting Shields, 25 F.3d at 1130). To support a finding of motive,[19] Plaintiffs rely on allegations of insider trading, the Company's debt repurchase obligations (CARZ and LYONs), the Company's need to maintain financial strength and debt ratings to access capital and grow the business, and the Individual Defendants' incentive bonuses.

> a.    Stock Sales

Plaintiffs rely on a mischaracterization of the Individual Defendants' sales of XL's stock during the Class Period as evidence of motive, claiming that the Individual Defendants engaged in insider trading around the time that they made false or misleading statements to investors and

---

[19]    Defendants do not contest that they had the "opportunity" to commit fraud.

analysts. While "unusual" insider stock trading may give rise to an inference of fraudulent intent or scienter, see In re Scholastic Corp. Securities Litigation, 252 F.3d at 74, "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d at 561 (citations omitted); see also Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (noting that corporate insiders may sell stock for reasons other than insider trading, including "to fund major family expenses, diversify [a] portfolio, . . . arrange [an] estate plan," or pay children's college tuition). "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" In re Silicon Graphics Inc. Sec. Litig., 183 F.3d at 986 (citation omitted). To determine whether trading activity is "unusual," courts should consider various factors, including "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." In re Scholastic Corp. Sec. Litig., 252 F.3d at 74-75 (citing Rothman, 220 F.3d at 94). Plaintiffs bear the burden of demonstrating that Defendants' stock sales are "unusual." See Acito v. IMCERA Group, 47 F.3d 47, 54 (2d Cir. 1995).

First, Plaintiffs' allegations with regard to insider trading relate to an exceedingly lengthy class period. The allegedly fraudulent activity lasted 102 weeks, or almost 24 months. See In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) (finding a sixty-three week class period "unusually long"); Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 185 (4th Cir. 2007) (finding a forty-six month class period "exceedingly long"). Lengthening the Class Period permits Plaintiffs "to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period." In re Vantive

Corp. Sec. Litig., 283 F.3d at 1092. For this reason, "[a]lleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades," and "strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim." Teachers' Ret. Sys., 477 F.3d at 185.

Plaintiffs, in alleging that Defendants' trading activity during the Class Period gives rise to an inference of scienter, focus solely on Defendants' sales of XL stock during the Class Period. The SAC alleges only the number of shares each executive sold, the share price on the date sold, and the gross profit realized from each sale. It is impossible, from the information provided by Plaintiffs, to determine whether the sales were "unusual in timing or amount." Plaintiffs fail to provide evidence of Defendants' prior sales of XL stock, which, if similar to the pattern of sales during the class period, could undermine any inference of fraud arising from them. See Ressler, 75 F. Supp. 2d at 59-60 & n.8 ("large proceeds alone are not suspicious per se," and "other relevant facts," including the pattern of the insiders' prior sales of company stock "may undermine any inference of fraud arising from them"); In re Sina Corp. Sec. Litig., 2006 U.S. Dist. LEXIS 71089 at *36-37, 2006 WL 2742048 (because the plaintiffs failed to list stock sales prior to the class period, the court was unable to determine whether the individual defendants' trading activity was "unusual"); In Re K-Tel Int'l Sec. Litig., 300 F.3d 881, 896 (8th Cir. 2002) (finding no inference of scienter from insider stock sales where the plaintiffs "failed to allege the prior history of sales for the defendants or even the number of shares held by each"). The Court is entitled, however, to take judicial notice of XL's filings with the SEC in order to examine the Individual Defendants' trading activity during the Class Period as compared with

47

their prior activity. <u>In re Sina Corp. Sec. Litig.</u>, 2006 U.S. Dist. LEXIS 71089 at *37, 2006 WL 2742048. The Court also takes judicial notice of XL stock price data from June 1, 1999 through May 31, 2004 obtained from S&P. <u>See</u> <u>Flickinger</u>, 789 F. Supp. at 620; <u>Pryor</u>, 1991 WL 346368 at *17 n.17.

The Individual Defendants' sales during the Class Period, when compared with the Individual Defendants' prior trading history, are not unusual in timing or amount. Indeed, two of the Individual Defendants, CEO O'Hara and outside Director Bornhuetter, sold significantly more stock in the twenty-two month period prior to the twenty-three-month Class Period than they did during it.[20] Moreover, Defendants' sales appear to be fairly evenly distributed throughout the Class Period, rather than "clustered at its end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted." <u>In re BISYS Sec. Litig.</u>, 397 F. Supp. 2d at 444-45; <u>see also</u> <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d at 561 (rejecting stock sales as the basis for a motive allegation where the evidence showed "a consistent pattern of trading").

Plaintiffs' formula for calculating the percentage of shares sold fails to account for the Individual Defendants' stock acquisitions during the Class Period. All of the defendants purchased stock during the Class Period and two of the defendants, Defendant and CFO de St. Paer and Defendant Brown, actually *increased* their total holdings by over fifteen percent during the Class Period, "a fact wholly inconsistent with fraudulent intent." <u>In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d at 561; <u>see also</u> <u>Ressler</u>, 75 F. Supp. 2d at 60 ("Inferences of scienter

---

[20] Defendant O'Hara sold 202,279 shares of stock from January 1, 2000 through October 31, 2001, as compared to only 121,000 shares from November 1, 2001 through October 16, 2003, the Class Period. Defendant Bornhuetter sold 162,543 shares of stock from January 1, 2000 through October 31, 2001, as compared to only 62,440 shares during the Class Period.

can be undermined when an insiders' sales of stock are offset by even larger stock acquisitions during the relevant time period.").  Moreover, CFO de St. Paer did not sell, but only purchased, shares of XL stock during the Class Period, further negating any inference of scienter. See Druskin, 299 F. Supp. 2d at 1336 n.40 ("The fact that the CEO, who held a significant amount of shares and who would have been an essential participant in any fraudulent scheme, did not sell stock undermines any suggestion of knowledge on the part of the defendants due to any other claimed inside sells."); In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d at 383-84 (fact that the chairman and CEO who made the alleged false statements did not sell, but actually purchased shares during the class period rebuts inference of scienter from other defendants' stock sales); In re FVC.com Sec. Litig., 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000), aff'd, 32 Fed. Appx. 338 (9th Cir. 2002) ("the fact that [the company]'s President and CEO . . . did not sell any of his stock . . . negates any slight inference of scienter"); In re Health Mgmt. Sys., Sec. Litig., No. 97 Civ. 1865 (HB), 1998 U.S. Dist. LEXIS 8061, at *18, 1998 WL 283286 (S.D.N.Y. June 1, 1998) (holding that the fact that two of the defendants, including the CFO, did not sell, but actually purchased shares undermines the plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at a huge profit, even though the other defendants had sold, on average, in excess of twenty percent of their holdings during the class period); see also San Leandro Emergency Med. Group, 75 F.3d at 814 ("the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive"); Acito, 47 F.3d at 54 (holding that lack of sales by several defendants "undermines plaintiffs' claim that defendants delayed notifying the public 'so that

49

they could sell their stock at a huge profit'").

Plaintiffs emphasize the size of the stock sales and the Individual Defendants' profit therefrom, alleging that the Individual Defendants sold 402,575 shares of XL stock for proceeds of more than $35 million during the Class Period. The gross proceeds, without more, do not aid the analysis:

> The significance of insider transactions in the scienter analysis is what, if anything, they suggest about the likely intent of the insiders. The gross proceeds, standing alone, tell us very little. Far more significant is the extent to which sales ahead of disclosure of negative news or purchases ahead of the disclosure of positive news lead logically to the conclusion that the insiders were aware of the news at the times of the transactions. For example, a sale of a large proportion of an insider's holdings shortly before disclosure of negative news that has a substantial downward impact on the share price suggests one thing while a sale of a small proportion of an insider's holdings comparably prior to disclosure of such news suggests something else. And while the gross proceeds may be relevant to scienter, they are not very probative where, as here, the complaint is essentially devoid of other factual allegations indicative of culpable knowledge or intent.

In re BISYS Sec. Litig., 397 F. Supp. 2d at 445. Because, as discussed below, the Court has not found the timing of the sales to be inherently suspicious, the gross proceeds, on their own, do not support an inference of scienter.

Moreover, "even large stock sales are not probative of scienter unless they are significant in comparison to the total number of shares an insider holds." In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001); see also In re Buffetts, Inc. Sec. Litig., 906 F. Supp. 1293, 1300 (D. Minn. 1995) (seven defendants' stock sales for millions of dollars not suspicious; sales "small compared with total holdings"). Although they sold 402,575 shares of XL stock during the Class Period, the Individual Defendants also acquired 327,321 shares, a fact that further undermines the inference of scienter. As noted previously, Defendants de St. Paer and Brown actually increased their holdings during the Class Period. From the beginning to the end

of the Class Period, taking into account each Defendants' Class Period acquisitions, Defendant CEO O'Hara decreased his holdings by 6.83%, Defendant Keeling decreased his holdings by 14.42% and Defendant Bornhuetter decreased his holdings by 30.84%. Courts have found no inference of scienter in cases involving similar and even greater percentages of sales. See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d at 1092-93 (sales of 38% of the defendants' holdings failed to raise a strong inference of fraud); Ronconi, 253 F.3d at 435-36 (finding that sales of 10% and 17% of holdings were not suspicious in amount, and finding that sales of 69% to 98% of holdings were suspicious in amount, but were insufficient to support an inference of scienter because they were not also suspicious in timing).

The fact that Defendant O'Hara—the insider who made the majority of the representations at issue—decreased his holdings during the Class Period by only 6.38%, weakens an inference that the stock sales were suspicious. See Ronconi, 253 F.3d at 435 (noting the fact that the two insiders who made the most representations had sold only 10% and 17% of their total number of shares and options); but see Schlagal v. Learning Tree Int'l., No. CV 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306, at 51 & n.13 (C.D. Cal. Dec. 23, 1998) (the absence of insider selling by one defendant, the CFO, does not negate an inference of motive). In In re Vantive Corp. Sec. Litig., the court found a CEO's sales of only 13% of his total number of shares and vested options over the course of a fifteen-month period was not suspicious and actually negated an inference of fraud, since in "his position as CEO and as the person most quoted in the complaint, [the defendant CEO] was presumably in the best position to know the 'true' facts," however, "his trading percentage belies any intent to rid himself of a substantial portion of his holdings." 283 F.3d at 1094.

The most suspicious insider sales, in terms of the amount sold, were by Defendant Bornhuetter, who is and was, at all times during the Class Period, an outside director at XL.[21]  A review of Bornhuetter's trading history, however, reveals that his trades during the Class Period were not "dramatically out of line with prior trading practices"[22] and were not conducted "at times calculated to maximize the personal benefit from undisclosed inside information." In re Vantive Corp. Sec. Litig., 283 F.3d at 1092.  Moreover, Bornhuetter, as an outside director who is not involved in the day-to-day running of business, is the least likely of all the Individual Defendants to know the "true" facts and is not alleged to have made any of the misleading statements at issue. See In Re Silicon Graphics Sec. Litig., 183 F.3d at 988 (finding relevant the fact that a particular insider did not make any of the allegedly misleading statements). Accordingly, Bornhuetter's sales do not give rise to an inference of scienter.

Plaintiffs also argue that Defendants engaged in "massive insider trading" just prior to and after XL's February 12, 2002 announcement of the $180 million increase to NAC Re's loss reserves, which Plaintiffs contend shows their knowledge or scienter.  According to Plaintiffs, Defendant O'Hara's statements during the February 13, 2002 conference call following the reserve increase announcement, including his statements that "[w]e think we've turned a corner now" and that the Company had sufficient assets to supports its AA ratings,[23] were designed to

---

[21]     Defendant Bornhuetter decreased his holdings by only 30.84%.  As noted above, courts have found no inference of scienter in cases involving greater percentages of sales. See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d at 1092-93 (sales of 38% of the defendants' holdings failed to raise a strong inference of fraud).

[22]     As noted above, Bornhuetter sold significantly more stock in the twenty-two month period prior to the Class Period than he did during the twenty-three month Class Period.

[23]     O'Hara also stated that "[i]f more capital is required, we can respond with non-equity, non-common stock capital."  Plaintiffs have not alleged that this statement is false or misleading.

52

reassure investors and artificially increase the share price of XL stock. Indeed, the share price rose from $91.25 on February 12, 2002 to $97.11 at closing on February 13, the day of O'Hara's statements. According to Plaintiffs, Defendants' $22.6 million in stock sales represent 59% of their Class Period shares and over 63% of their total Class Period sales. (Pls.' Mem. Opp'n Mot Dismiss 2-3 (citing SAC ¶ 47).) An examination of the trading data, however, reveals that there were no sales by any of the Individual Defendants during the period from December 12, 2001 (two months prior to the February 12, 2002 announcement) until February 19, 2002.

Disregarding the sales prior to the announcement,[24] the trading data indicates that Defendant O'Hara sold a total of 45,000 shares over February 19 and 20, 2002, on which dates the price of XL stock was lower than it had been for the three days prior to the sale and lower than it was for eight of the ten days following the sale. Defendant Bornhuetter sold a total of 30,000 shares over February 19, 20, 25 and 27, 2002; Defendant Brown sold 21,500 shares on March 4, 2002; and Defendant Keeling sold a total of 102,635 shares over March 6, 7 and 8, 2002. Plaintiffs, however, fail to include the Individual Defendants' acquisitions during this time period. The trading data indicates that Defendant Brown purchased a total of 25,500 shares over March 4 and 7, 2002 and Defendant Keeling purchased a total of 102,635 shares on March 6, 2002. For Defendants Brown and Keeling, their stock acquisitions more than offset their sales. O'Hara's sales of 45,000 shares constituted roughly 12% of his total holdings on that date, while Bornhuetter's sales of 30,000 shares constituted roughly 25% of his total holdings on that date. Although the sales were not insignificant, the timing and amount of the sales does not, without

---

[24] Plaintiffs do not explain why shares sold more than two months before the announcement are indicative of scienter.

more, give rise to a "strong" inference of scienter. Both O'Hara and Bornhuetter sold six or more days after the announcement, giving the market adequate time to absorb and respond to the information. Moreover, neither defendant sold stock in any significant amount prior the announcement, when it was equally likely that the announcement of a $184 million reserve increase could have caused the stock price to drop.

Plaintiffs allege that by May 22, 2003, Defendants had knowledge of XL's insufficient credit support and need to set up insurance trusts to provide security for NAC Re to prevent it from having to write its accounts down to zero. (Pls.' Mem. Opp'n Mot. Dismiss 39-40.) Plaintiffs allege that Defendants sold large amounts of XL stock prior to the July 14, 2003 announcement of this transaction, dumping a total of 82,980 shares and taking in proceeds of $6.8 million. (Id. at 40.) A review of the trading data indicates that Defendant O'Hara sold a total of 12,000 shares on June 2, 2003 and purchased 43,500 shares on June 11, 2003. Defendant Brown purchased a total of 30,000 shares on June 11, 2003 and sold 30,000 shares on that same date. Defendant Keeling sold 5,000 shares on June 10, 2003 and 5,000 shares on July 8, 2003. Finally, Defendant Bornhuetter purchased 83,265 shares and sold 57,543 shares on June 6, 2003. According to the trading data, all but Defendant Keeling—who sold only 10,000 shares, an amount consistent with his prior and subsequent trading patterns—purchased more shares than they sold in the time from May 22, 2003 until the July 14, 2003 announcement.

Plaintiffs also allege that "defendant Keeling's sale of 10,000 shares just after XL announced its 2003 forecast of $8 per share is . . . suspicious." (Pls.' Mem. Opp'n Mot. Dismiss 40.) Defendant O'Hara, speaking on behalf of XL, announced its 2003 forecast of $8 per share for the first time on July 31, 2002 during a conference call for analysts, in which Defendant

O'Hara predicted "strong performance" and stated that the Company "currently expect[s] growth of $8 per share, perhaps in the $8.10 to $8.20 range per share as initial guidance." This was reiterated in an April 29, 2003 conference call with analysts, in which O'Hara stated that the Company's "guidance for the fall under 2003 remains at $8.00 per share." Again, in an August 1, 2003 conference call, O'Hara stated that he did not "believe any change in [XL's] previous guidance for 2003 is warranted." A review of the trading data did not reveal any sales by Defendant Keeling "just after" any of those dates.

On October 17, 2003, the Company announced that it was increasing NAC Re's loss reserves by $184 million and needed to conduct an intensive claims audit review of its cedants' files, causing XL's share price to fall from $79.4 per share on October 16, 2003 to close at $73.37 per share on October 17, 2003. The share price continued to fall, reaching a low of $68.11 per share on November 5, 2003 before beginning to climb back up. A review of the trading data indicates that Defendant O'Hara sold 40,000 shares, or roughly 10% of his holdings, on October 1, 2003, and Defendant Keeling sold 5,000 shares, or roughly 4% of his holdings, on October 14, 2003. These sales, involving only two of the Individual Defendants, did not comprise a significant portion of either defendant's holdings. Moreover, Defendants contend that the O'Hara's October 1, 2003 sale of 40,000 shares and Defendant Keeling's October 14, 2003 sale of 5,000 shares were made pursuant to Rule 10b5-1 Trading Plans adopted on November 27, 2002 and June 4, 2003, respectively. Although the existence of a Rule 10-b5-1 Trading Plan is an affirmative defense that must be pled and proved, see 17 C.F.R. § 240.10b5-1(c)(1)(i), the Supreme Court recently instructed that a court examining whether a complaint's scienter allegations can survive threshold inspection for sufficiency under the PSLRA "must

engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also [plausible] competing inferences rationally drawn from the facts alleged." <u>Tellabs</u>, slip op. at 2, 2007 U.S. LEXIS 8270 at *11; <u>see also</u> <u>SEC v. Healthsouth Corp.</u>, 261 F. Supp. 2d 1298, 1322 (N.D. Ala. 2003) (holding that "it is a defense to an allegation of violation of Section 10b and Rule 10b5-1, if the person making the purchase or sale demonstrates that the purchase or sale that occurred was made pursuant to a plan"). Plaintiffs argue that even if the Court were to consider Defendants O'Hara and Keeling's trading plans, questions of fact remain with regard to the question of whether Defendants timed the October 17, 2003 disclosure until after their alleged planned stock sales, the plan's genuineness, and the proper disposition of stocks thereunder. (<u>See</u> Pls.' Mem. Opp'n Mot. Dismiss 40 n.49.) Because it is questionable whether the trading plans should be considered and because issues of fact remain with regard to the trading plans, the Court will not consider them. The minimal stock sales prior to the announcement, however, fail to give rise to a "strong inference" of scienter.

Far from supporting a "strong inference" that Defendants had a motive to capitalize on artificially inflated stock prices, the Individual Defendants' minimal stock sales compared to their acquisitions during the Class Period suggest that they had every incentive to keep the Company profitable. <u>See</u> <u>Advanta Corp. Sec. Litig.</u>, 180 F.3d at 540-41 (the fact that three defendants sold no stock and the other two defendants only sold five percent and seven percent of their total holdings during the class period indicates that the defendants "had every incentive to keep Advanta profitable"); <u>Burlington Coat Factory</u>, 114 F.3d 1410, 1422 n.12 (3d Cir. 1997) (finding no motive and opportunity because plaintiffs failed to explain "how a temporary inflation of . . . stock price would help management increase its compensation or preserve its

jobs"). The sales at issue here were not out of line with prior trading practices. Although the profits realized by the Individual Defendants from their stock sales were large relative to their base salaries, "these proceeds . . . were an intended part of their overall compensation package." In re Advanta Corp. Sec. Litig., 180 F.3d at 541; see also Burlington Coat Factory, 114 F.3d at 1424 ("A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events."). Finally, the SAC fails to connect any of the Individual Defendants' sales with any particular allegedly false or misleading statements. Because Plaintiffs have failed to show that the Individual Defendants' stock sales are unusual in amount or in timing, the allegations are not sufficient to give rise to a "strong inference" of scienter.

### b. *Generalized Motive Allegations*

The Second Circuit has held, with regard to motive allegations, that "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit, 264 F.3d at 141 (citing Novak, 216 F.3d at 307-08). Motives that the Second Circuit has found insufficient include: "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." Id. Although motive has been held to be sufficiently pled where plaintiffs "alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares," Novak, 216 F.3d at 308 (citing cases), more generalized motives, "which could be imputed to any publicly-owned, for-profit endeavor, [are] not sufficiently concrete for purposes of inferring scienter." Kalnit, 264 F.3d at 140 (quoting Chill v. General Electric Co., 101 F.3d 263, 267 (2d Cir. 1996)). A

company's desire to maintain high credit and bond ratings, along with other similarly generalized motives, have been found to be insufficient, because such desires can be imputed to all companies. San Leandro, 75 F.3d at 814 (company's desire to maintain a high bond or credit rating did not qualify as sufficient motive); Novak, 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating. . . ."); Leventhal v. Tow, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (plaintiff's allegations that defendants had a motive to artificially inflate stock price to get more favorable terms in stock-for-stock transactions and debentures are too generalized to establish scienter); see also Johnson, 399 F. Supp. 2d at 114 ("seeking to maximize [the company]'s profitability constituted 'part of the officers' and directors' financial responsibilities to the Company'").[25]

As discussed above, XL, in 2001, issued CARZ and LYONs debt securities which gave bondholders the right to require XL to repurchase the bonds on predetermined put dates at predetermined values, or if XL's financial strength and credit ratings fell below the level of "BBB+." According to Plaintiffs, if all bondholders had put their shares to the Company for repurchase, the Company would have had to pay a minimum combined price of $909 million. (SAC ¶¶ 30-31, 106.) Plaintiffs allege that Defendants failed to take the necessary reserve increases and made false and misleading statements in order to maintain XL's credit and bond ratings and avoid having to pay these outstanding debts. Avoidance of puts and concerns about

---

[25] Two of the cases cited by Plaintiffs to the contrary, In re Time Warner Sec. Litig., 9 F.3d 259 (2d Cir. 1993) and In re Kidder Peabody Sec. Litig., No. 94 CIV. 3954 (JFK), 1995 U.S. Dist. LEXIS 14481 (S.D.N.Y. Oct. 4, 1995), were decided prior to the enactment of the PSLRA. Howard v. Everex Sys., 228 F.3d 1057 (9th Cir. 2000) discusses the PSLRA, but its discussion is at odds with the Second Circuit caselaw cited in this section.

debt ratings fall squarely within the category of generalized allegations which the Second Circuit has held to be generic to all corporations and which they have rejected as facts from which a strong inference of scienter may be inferred. See San Leandro, 75 F.3d at 814; Novak, 216 F.3d at 307.

Plaintiffs also allege that Defendants failed to properly reserve for losses at NAC Re and leveraged XL's false financials and financial strength and debt ratings to finance growth through $1.8 billion in equity and debt offerings during the Class Period. A motive to obtain bank financing, as with the motive to avoid puts, is a generalized allegation generic to all corporations. If such a motive were held to be sufficient, all companies seeking to finance growth could be the subject of securities fraud actions. See, e.g., Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1414 (S.D.N.Y. 1996) ("It is not sufficient . . . to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital.").

Finally, Plaintiffs allege that the Individual Defendants' large incentive bonuses supports an inference of scienter. According to the SAC, the Individual Defendants received more than $8.1 million in incentive bonuses ranging from 66% to 469% of their annual salaries during the Class Period.[26] Unlike the more generalized allegations discussed above, incentive bonuses provide a "concrete and personal benefit" sufficient to raise an inference of scienter. See In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (finding that a $3

---

[26]     According to the SAC, Defendant O'Hara received $1 million in bonuses in 2001 and 2002 and no bonus in 2003; Defendant de St. Paer received bonuses of $850,000 in 2001, $700,000 in 2002 and $300,000 in 2003; Defendant Brown received bonuses of $450,000 in 2001, $3.05 million in 2002 and no bonus in 2003; and Defendant Keeling received bonuses of $300,000 in 2001, $500,000 in 2002 and no bonus in 2003. (SAC ¶ 46.)

million bonus, more than two and a half times the defendant's salary, provided "an even greater motive for inflating the appearance of [the company]'s financial performance," and, together with other sufficient motive allegations, supported an inference of scienter).  In today's corporate environment, however, nearly all executives are compensated with stock options and incentive bonuses.  Recognizing this, the Second Circuit has rejected performance-based or incentive compensation as evidence of motive sufficient to support a strong inference of scienter, noting that "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Acito, 47 F.3d at 54; In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d at 561 (same); Ferber v. Travelers Corp., 785 F. Supp. 1101, 1107 (D. Conn. 1991) (same).  Although the "overstatement of earnings at just the right time to benefit [defendants] provides an unusual, heightened showing of motive to commit fraud," Florida State Bd. of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 661 (8th Cir. 2001), there is no allegation here that there was something particular about the period of time at issue that motivated the Individual Defendants to commit fraud. See Shields, 25 F.3d at 1130 ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning. There is no claim here that false statements were made in an effort to sell off shares held by management, or to delay a criminal prosecution.").  In Green Tree, for example, the company had the "highest paid business executive in the entire United States," who "knew that 1996 would be the last year for which he would receive bonus compensation valued in the tens of millions of dollars." 270 F.3d at 661.[27]  Indeed, "[e]ven in the

---

[27]     "In 1995 and 1996, [the defendant] was paid, in cash and deeply discounted stock, $65 million and $102 million, respectively." Green Tree, 270 F.3d at 661.

Second Circuit, pleading that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings." Id. (citing Novak, 216 F.3d at 307; Acito, 47 F.3d at 54). Unlike in Green Tree, there is no allegation here that the Class Period comprised the last years for which the Individual Defendants would receive large bonuses. Plaintiffs allege that the majority of the Individual Defendants received no bonuses in 2003, however, that is a reasonable and likely result of the Company's weak performance following the announcement of the $663 million reserve increase. (SAC ¶ 46.) Moreover, in Green Tree, the defendant received $102 million in compensation. Where, as here, "[a] salary of that magnitude is not at issue," courts have found that the "desire to maintain a high stock price in order to increase executive compensation" is insufficient as a motive allegation. In re Synovis Life Techs., Inc. Sec. Litig., No. 04-3008 ADM/AJB, 2005 U.S. Dist. LEXIS 18187, 2005 WL 2063870, at *16 (D. Minn. Aug. 25, 2005). This case falls squarely within the Second Circuit's general rule that receipt of incentive compensation, including performance-based bonuses, does not, by itself, establish motive. See Kalnit, 264 F.3d at 139 ("Insufficient motives . . . can include . . . the desire to keep stock prices high to increase officer compensation.") (citing Novak, 216 F.3d at 307-08); Acito, 47 F.3d at 54 (allegation that defendants were motivated by a desire to maintain or increase executive compensation was insufficient because such a desire can be imputed to all corporate officers); In re BISYS Sec. Litig., 397 F. Supp. 2d at 444 ("The Individual Defendants' alleged desire to increase or maintain their compensation packages is insufficient to give rise to an inference of scienter.").

In sum, Defendants' allegations of motive, taken individually or considered as a whole, fail to give rise to an inference of scienter. See In re Carter-Wallace, Inc. Sec. Litig., No. 94 Civ.

5704, 1999 U.S. Dist. LEXIS 17526, 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999) ("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one or more specific motives."), aff'd, 220 F.3d 36 (2d Cir. 2000); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d at 382 n.11 ("If a motive is so generic as to be unsuspicious, and the plaintiff does not allege any particular facts as to why that motive in the individual case is suspicious, then it adds nothing to the 'total mix.'").

### 2. Circumstantial Evidence of Conscious Misbehavior or Recklessness[28]

Plaintiffs also allege that the terminations and resignations of several Company officers, the magnitude of the reserve increases, the fact that the alleged accounting improprieties at XLRA violated GAAP and the Company's own publicly-stated actuarial and accounting policies, and statements by the Individual Defendants regarding the sufficiency of the Company's credit support give rise to an inference of scienter. The Court must examine, then, whether Plaintiffs' allegations demonstrate "strong circumstantial evidence" of Defendants' "conscious misbehavior or recklessness." Kalnit, 264 F.3d at 142.

Where motive is not apparent and where Plaintiffs must plead scienter by "identifying circumstances indicating conscious behavior by the defendant," "the strength of the circumstantial allegations must be correspondingly greater." Beck v. Mfrs. Hanover Trust Co., 820 F.2d 46, 50 (2d Cir. 1987) (citations omitted), overruled on other grounds by United States

---

[28] Although every Court of Appeals to consider the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, the Supreme Court has declined to consider whether and when recklessness satisfies the scienter requirement. See Tellabs, slip op. at 7 n.3, 2007 U.S. LEXIS 8270, at *20 n.3. Until the Supreme Court decides otherwise, this Court will follow the Second Circuit and find that Plaintiffs may meet the scienter requirement by alleging "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit, 264 F.3d at 138-39.

v. Indelicato, 865 F.2d 1370 (2d Cir. 1989) (en banc).  The Second Circuit has elaborated on the

"conscious misbehavior" theory:

> To survive dismissal under the "conscious misbehavior" theory, the appellants must show that they alleged reckless conduct by the appellees, which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."

In Re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). This is a

highly fact-based inquiry, however, generalities can be drawn:

> Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

Novak, 216 F.3d at 308.

<em>a.      Failure to Increase Loss Reserves</em>

Plaintiffs allege that Defendants' "deliberate disregard" for known loss trends of reported

claims and failure to increase XL's loss reserves correspondingly demonstrates Defendants'

recklessness. (See Pls.' Mem. Opp'n Mot. Dismiss 30.)  Plaintiffs argue that they "have

adequately demonstrated defendants' scienter by showing defendants' access to and having

received reports of the 'due and owing' claims submitted by the cedant companies and

defendants' knowledge or reckless disregard of known loss trends and numerous red flags." (Id.

at 31.)  The "red flags" Plaintiffs refer to include the loss reserve increases for accident years

1997 through 2000 and NAC Re's alleged inability to timely and accurately process claims

records and set reserves.

Plaintiffs allege that CW1 reported that accounting problems at NAC Re were "well

63

known" to XL's management team in Stamford, Connecticut and that information regarding claims he or she collected and assembled from ceding companies, including checks and statements sent by ceding companies, was sent directly to XL's VP of Claims for NAC Re, David Hughes, in XL's Stamford, Connecticut headquarters. (SAC ¶¶ 76, 78.)  As discussed previously, however, there is no allegation in the SAC that Hughes passed this information on to any of the Individual Defendants, or anyone else at XL.  Accordingly, even assuming this information was relevant to the determination of reserve levels (which has not been shown), this information cannot form the basis of the Individual Defendants' knowledge of problems at NAC Re because there is no showing that they were aware of it.

Plaintiffs argue that because the loss reserve increase were from policies underwritten on a claims-made basis, claims from the 1997 to 1999 underwriting years had to be submitted to NAC Re during this time period or shortly thereafter, otherwise no liability would attach. (Pls.' Mem. Opp'n Mot. Dismiss 13.)  The fact that the policies were "claims-made," however, only affects the date by which the insureds must report claims to the ceding companies.  It is not clear how long it took for ceding companies to report claims to XLRA. See Delta Holdings, 945 F.2d at 1229-33 (noting the "historic lag" in reporting claims to reinsurers).  Plaintiffs argue that if Defendants had conducted claims audits at its ceding companies, as represented to investors, Defendants would have discovered the claims data had already been reported and would have enabled XL to set adequate loss reserves, as required by GAAP. (SAC ¶¶ 71-85, 94.)  Plaintiffs argue therefore, that Defendants' statements that XL conducted claims audits at its ceding companies, (see SAC ¶¶ 67, 91, 107, 130), was false.  As discussed previously, however, Defendants did not claim to, nor did they have any obligation to conduct claims audits at its

ceding companies. Defendants represented that they conducted claims audits for specific claims and claims procedures at the offices of *selected* ceding companies, a claim that has not been shown to be false.

Plaintiffs allege, based on the confidential witness reports of accounting problems at NAC Re, that Defendants knew or should have known that the loss reserve amounts were not accurate. The SAC, however, fails to reference any actual reports reviewed by any specific individuals, including the Individual Defendants, at XL on any specific date that indicated that NAC Re's loss reserves were not sufficient, or even that the Individual Defendants were aware of the accounting improprieties at NAC Re. See Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."). The Second Circuit has found allegations of circumstantial evidence of fraudulent intent to be sufficient "where defendants failed to timely disclose material data which resulted in misrepresentations of the defendant companies' current finances where it was clearly pled that the defendants knew or should have known better." In re DRDGold Ltd., 472 F. Supp. 2d at 572 (citing cases). Here, however, the SAC contains no allegation that XL failed to disclose any actual data which would have changed a reasonable investor's understanding of NAC Re's current financial situation with regard to the loss reserves. Here, as in Shields, "[t]he [SAC] strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud." 25 F.3d at 1129.

        *b.*     *Termination and Resignation of Senior Executives*

On January 14, 2004, one day after announcing the $663 million increase to XLRA's loss

reserves, XL fired C. Fred Madsen, President of NAC Re reinsurance operations, and Martha

Bannerman, XL's General Counsel and Chief Administrative Officer of its NAC Re reinsurance

operations. (SAC ¶¶ 42, 212.) One week later, Defendant Brown, Chief Executive Officer of

XL's insurance and formerly Chief of Reinsurance Operations at NAC Re, left the Company. (Id.

¶¶ 42, 214.) Plaintiffs allege that the timing of these terminations and resignation raises a strong

inference that the terminations and resignation were connected to the false financial reports.

Plaintiffs have alleged no facts, however, connecting Madsen, Bannerman or Brown to the

alleged fraud.[29] Plaintiffs have alleged and the NYID found various management problems,

accounting deficiencies, and lack of organization. In the absence of facts connecting Madsen,

Bannerman and/or Brown to the alleged fraud, it is more likely that they were terminated and

resigned as a result of company mismanagement, not securities fraud. See In re BISYS Sec.

Litig., 397 F. Supp. 2d at 448 ("absent any alleged facts linking the two resignations and the

alleged fraud, the resignations of [two former CFOs] do not support an inference of conscious

misbehavior or recklessness"); Stambaugh v. Corrpro Cos., Inc., 116 Fed. Appx. 592, 598 (6th

Cir. 2004) (resignations of a number of chief financial officers most likely were caused by a long

period of corporate mismanagement, not by fraud, and failed to support an inference of scienter

---

[29]     Plaintiffs' only attempt to link Madsen, Bannerman and Brown to the alleged fraud consists of a
statement by Defendant Keeling at the January 14, 2004 press conference. At that press
conference, an analyst noted that "[s]o far there really hasn't been any discussion of whether there
is any management accountability here," and asked whether it "relate[d] to documentation or the
way in which the treaties were originally written?" Defendant Keeling responded, saying that
"[t]he President and General Counsel and Chief Administrative Officer of XL Re America are no
longer with the company." (SAC ¶ 213; Ex. A to Oliver Decl. at 10.) The analyst then stated, "I
see. So it's not an issue of documentation; it was an issue of not finding that the appropriate
procedures and so forth were in place to properly assess what was being written?" Defendant
O'Hara responded that "it encompasses a number of factors and the calculus is not simple." (Id.)
Far from connecting these individuals to the alleged fraud, this exchange supports the more
compelling inference that these individuals were terminated as a result of company
mismanagement.

where plaintiffs failed to allege any connection between the resignations and the alleged fraud); Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003) (successive resignation of key officials did not create an inference of scienter because it was "more likely probative only of the fact that the company was failing"); Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002) (finding that resignations, without additional evidence that accounting irregularities were the reason for the resignations, do not have "any scienter implications"); In re Synovis Life Techs., Inc. Sec. Litig., 2005 WL 2063870 at *16 (finding the resignation of a senior executive following the fall in a company's stock price insufficient to raise a strong inference of scienter, because "senior corporate officers often resign or are terminated if their division of the corporation performs poorly"); In re Interpool, Inc. Sec. Litig., No. Civ. 04-321 (SRC), 2005 U.S. Dist. LEXIS 18112, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) ("The Third Circuit, and other courts have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud.") (citing In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 Fed. Appx. 465 (3d Cir.2004)); Kurtzman v. Compaq Computer Corp., No. Civ. A. H-99-779, 2002 U.S. Dist. LEXIS 26569, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) ("[T]here are many reasons not related to fraud why people resign and more is needed before one reasonably could infer, no less before a strong inference arises, that the resignations were motivated by anything besides a sense of inadequacy for the job in the face of [the company's] troubles.") (internal quotation marks omitted).  Madsen and Bannerman are not named as Defendants in this action.  Therefore, even if Plaintiffs had alleged facts linking their terminations to the alleged fraud, "it is hard to see how the resignation of an executive who has not been named as a defendant in this action could create an inference of scienter with respect to

the [five] individuals who have been named." In re BISYS Sec. Litig., 397 F. Supp. 2d at 447.

Cases which have found the separation of senior corporate officers to be indicative of scienter have typically involved other strong evidence of fraudulent behavior, such as the restatement of prior financial statements of the defendant corporation. See, e.g., In re Adaptive Broadband Sec. Litig., No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. Apr. 2, 2002) (court held that because the resignation of several corporate officers "occurred as [the company]'s financials were being restated and as [the company] was conducting its own internal investigation," these facts, although insufficient on their own, were sufficient when taken together to "add one more piece to the scienter puzzle"); In re Mercator Software, Inc., 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (company's announcement of firing of CFO and VP of Finance on the same day it announced restatement of financial statements and acknowledged a 100% overstatement of earnings for prior quarters, together with other facts, sufficient to support inference of scienter); In re McKesson Hboc Sec. Litig., 126 F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) (large restatement of financial results coupled with announcement of improper revenue recognition and termination of employees "for cause" sufficient to support an inference of scienter); see also In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d at 176-77 (massive changes in financial results reported by [the company]'s new management immediately after the old management had resigned indicated that the results reported by the old management were false; court did not discuss resignations in determining whether the plaintiffs had alleged scienter). There was no allegation here that prior financial statements were restated and there is no other evidence of fraudulent intent. In this case, the termination of Madsen and Bannerman and the resignation of Brown are insufficient, without more, to support an inference of scienter.

Plaintiffs' allegation that Defendants failed to comply with GAAP and their own publicly-stated actuarial and accounting policies, standing alone, is insufficient to support a strong inference of scienter. <u>See</u> <u>Novak</u>, 216 F.3d at 309 ("allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be deemed sufficient."""). There is no showing here, as there must be, that Defendants "intentionally and deliberately" refused to comply with GAAP or follow their own internal accounting policies. <u>See</u> <u>id</u>. at 311 (plaintiffs adequately pleaded scienter where they alleged that defendants "intentionally and deliberately" refused to follow internal accounting policies); <u>Rothman</u>, 220 F.3d at 90-91 (plaintiffs adequately pleaded scienter where they alleged "a reckless failure to follow an announced policy"). In order to establish circumstantial evidence of recklessness for purposes of a securities fraud claim, Plaintiffs must not only allege accounting improprieties, but also allege corresponding fraudulent intent. <u>Novak</u>, 216 F.3d at 309; <u>see also</u> <u>In re BISYS Sec. Litig.</u>, 397 F. Supp. 2d at 448 ("plaintiffs' allegations that the Company's financial reports violated GAAP or their own internal policies merely establish that the reports were false. They do not establish that the Individual Defendants issued those reports with the requisite fraudulent intent."). Plaintiffs have adequately alleged, through the confidential witness reports, that there were accounting improprieties at XLRA, however, they have failed to show that Defendants were even aware of the improprieties, much less that they "recklessly disregarded" or "acted with gross indifference" toward them. <u>Johnson</u>, 399 F. Supp. 2d at 116. Here, as in <u>In re BISYS Sec. Litig.</u>, although "the Company's misleading financial reports may

have been caused by intentional fraud or recklessness, they could well be products of negligence or mismanagement," which do not support an inference of scienter. Id.[30]

The accounting deficiencies noted by Plaintiffs include the allegations that the review of XL's cedants' underwriting portfolios was not sufficiently comprehensive to adequately make reserve assessments and that XL's reserve review process did not sufficiently look at cedants' own claim files to assess the adequacy of their own reserves. (SAC ¶ 40.) It is not clear, however, that these are functions which reinsurers are required to assume. In Unigard Security Insurance Company v. North River Insurance Company, the Second Circuit explained the reinsurance business as follows:

> Reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. In practice, the reinsurer has no contact with the insured. To enable them to set premiums and adequate reserves, and to determine whether to "associate" in the defense of a claim, reinsurers are dependent on their ceding insurers for prompt and full disclosure of information concerning pertinent risks. . . . Reinsurance works only if the sums of reinsurance premiums are less than the original insurance premium. . . . For the reinsurance premiums to be less, reinsurers cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims.

4 F.3d 1049, 1054 (2d Cir. 1993) (internal citations omitted). Because reinsurers do not typically perform "extensive" claims audits of ceding companies, the alleged failure of Defendants to do so during the Class Period cannot be so "highly unreasonable" and/or "an extreme departure from the standards of ordinary care" as to constitute intentional misconduct or recklessness.

The SAC also contains conclusory allegations of deficiencies in XLRA's internal controls

---

[30]     Unlike the case at issue, In re BISYS Sec. Litig. involved financial statements that had been restated.  Accordingly, it was clear that a misstatement had occurred and PSLRA § 78u-4(b)(1) had been satisfied, see 397 F. Supp. 2d at 437, however, the court granted the motion to dismiss on the basis that the plaintiffs failed to adequately allege scienter, and thus failed to satisfy PSLRA § 78u-4(b)(2). See id. at 448-49.

with respect to claims processing.  Although a "'complete lack of internal controls' can constitute evidence of recklessness, the deficiencies alleged in the [SAC] do not rise to that level." <u>In re DRDGold Ltd. Sec. Litig.</u>, 472 F. Supp. 2d at 574 (quoting <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)).  Moreover, the Individual Defendants were employees of XL and worked in the Stamford office, whereas XLRA or NAC Re, its subsidiary, was based in Bermuda.  Although there are allegations of accounting improprieties and a lack of internal controls at XLRA, there is no allegation that XL or any of the Individual Defendants were actually aware of those alleged improprieties.  In a case such as this, courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls." <u>In re Comshare Inc. Sec. Litig.</u>, 183 F.3d 542, 553 (6th Cir. 1999).

Similarly, Plaintiffs cannot rely on the magnitude of the reserve charges as evidence of Defendants' conscious misbehavior or recklessness. <u>In re BISYS Sec. Litig.</u>, 397 F. Supp. 2d at 447 ("it is clear that 'the size of the fraud alone does not create an inference of scienter'") (quoting <u>In re WorldCom, Inc. Sec. Litig.</u>, 2003 U.S. Dist. LEXIS 10863, No. 02 Civ. 3288, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)).

Insofar as Plaintiffs' allegations of recklessness are based on Defendants' statements during the Class Period, the SAC must "specifically identify the reports or statements" containing the facts that allegedly contradicted Defendants' public statements. <u>Novak</u>, 216 F.3d at 309, 311; <u>see also</u> <u>Rombach</u>, 355 F.3d at 176 (rejecting the plaintiffs' claim based on recklessness because, <i>inter alia</i>, the "[p]laintiffs do not allege facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements"); <u>Johnson</u>, 399

F. Supp. 2d at 115 (dismissing complaint that failed to "point to any specific source from which defendants received knowledge of flaws in NYFIX's accounting," and holding that the "plaintiffs must plead specific facts from which one can strongly infer that defendants knew or should have known . . . the false or misleading nature of the statements regarding NYFIX's overall financial results" to show "conscious misbehavior" or "recklessness"). This has not been done here. As the Court has noted numerous times in this Ruling, the SAC does not allege the existence of a single fact or any memorandum, e-mail, letter, note, meetings or conversation that supports the SAC's allegations concerning: (1) the existence of known but undisclosed deficiencies in XLRA's loss reserves or (2) the communication of any such asserted deficiencies to any defendant. Although Defendants' statements regarding the adequacy of the loss reserves may be actionable under the theory that defendants did not actually believe them to be true or had no reasonable basis for such a conclusion, In re DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d at 569—which has not been shown here—"they would not be actionable under the securities laws if they simply represented a failure on the part of defendants to correctly gauge the adequacy of the loan loss reserves." In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d at 689 (citing, *inter alia*, Hinerfeld v. United Auto Group, No. 97 Civ. 3533 (RPP), 1998 U.S. Dist. LEXIS 10601, at *21-22 (S.D.N.Y. July 15, 1998) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws."); Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 7-8 (2d Cir. 1996) (stating that claim which amounted to an allegation that defendants were less skillful at balancing the portfolio than plaintiffs would have liked was not actionable under the securities laws); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 281 (3d Cir. 1992) ("Mere failure to provide adequate reserves . . . does not implicate the

concerns of the federal securities laws and is not normally actionable.")).

Plaintiffs' allegations are insufficient to establish conscious misbehavior or recklessness. Specifically, Plaintiffs have failed to show that Defendants engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In Re Carter-Wallace, Inc. Sec. Litig., 220 F.3d at 39. Although Plaintiffs' allegations are lengthy, that does not save the SAC. As the Second Circuit has made clear, Plaintiffs cannot establish scienter by combining "inadequate allegations of motive with inadequate allegations of recklessness." Kalnit, 264 F.3d at 141; see also In re BISYS Sec. Litig., 397 F. Supp. 2d at 449 ("Nor do plaintiffs save their claims from dismissal by arguing that their various allegations of motive and opportunity and conscious misbehavior or recklessness—though insufficient when considered in isolation—are somehow adequate when considered together.").

### C. Section 20(a) "Control Person" Allegations

Plaintiffs also allege that the Individual Defendants are "controlling persons" within the meaning of § 20(a) of the Exchange Act, and therefore derivatively liable for the Company's fraudulent acts. (See SAC ¶¶ 61-65.) Although the Individual Defendants do not dispute that they are "control persons," the § 20(a) claim must be dismissed because Plaintiffs have failed to establish the § 10(b) predicate for a § 20(a) claim.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Preclude Documents and Arguments Inconsistent with Judicial Notice [Doc. No. 150] is **granted in part** and **denied in part** and

Defendants' Motion to Dismiss [Doc. No. 154] is **granted**.  The clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, July  21 , 2007.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court